**BROWN & BROWN, INC., Plaintiff,**

v.

**Muhammad Munawar ALI, Defendant.**

No. 07 C 2893.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 7, 2009.

James M. Witz, Gia Fonte Colunga, Matthew John Kramer, Michael J. Kelly, William N. Krucks, Freeborn & Peters, LLP, Chicago, IL, Mark E. King, Brown & Brown, Inc., Daytona Beach, FL, for Plaintiff.

Alan S. Madans, Robin Korman Powers, Rothschild, Barry & Myers, P.C., Chicago, IL, for Defendant.

### *FINAL ORDER*

RUBEN CASTILLO, District Judge.

Plaintiff Brown & Brown, Inc., d/b/a Risk Management Services and Program Management Services, Inc. ("Brown"),

filed this suit against its former employee, Muhammad Munawar Ali ("Ali") for breach of a non-compete clause contained in his employment agreement. (R. 1, Compl.) Beginning on October 14, 2008, this Court held a four-day bench trial on Brown's claims. The Court also heard evidence pertaining to Brown's motion for contempt (R. 81) and supplemental motion for contempt (R. 134), in which Brown accuses Ali of violating a preliminary injunction previously entered by this Court. *See Brown & Brown v. Ali,* 494 F.Supp.2d 943 (N.D.Ill.2007). Also pending before the Court is a third motion for contempt and sanctions recently filed by Brown (R. 163), alleging that new evidence shows that Ali and other witnesses gave false testimony during the bench trial before this Court.

The Court concludes that the overwhelming evidence establishes Ali's liability in this case and that his conduct justifies serious contempt sanctions and possible criminal prosecution for perjury.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence[1] as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that the Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

### I. Brown's Business

1. Brown is a Florida corporation with its principal place of business at 220 South Ridgewood Avenue, Daytona Beach, Florida. (Agreed Facts ¶ 1.) Ali is a citizen of Illinois. (Agreed Facts ¶ 2.) The matter in controversy exceeds $75,000, exclusive of interest and costs. (*See* Agreed Facts ¶ 19.)

2. Brown and its subsidiaries comprise a national insurance organization broken into five divisions: retail; program management; service/third party administration; brokerage; and corporate support services. (PX002.) Brown has approximately 100 retail locations. (Parker Test. at 99:24–25; 100:1–12) Brown has more than 100 profit centers. (Snearer Test. at 574–75:23–3) Brown is among the insurance industry leaders with respect to public entity and non-profit insurance pools or trusts. (Parker Decl. ¶ 8.)

3. In January 2003, Ali began working for Brown as a wholesale insurance broker and subsequently became Brown's Executive Vice President or "profit center leader" of the Brown & Brown Public Entity Service ("BBPES") Chicago office. (Parker Decl. ¶ 12; Ali Aff. ¶ 4; PX001; Ali Test. at 145:06–13, 152:16–153:05; Cothron Test. at 657:10–12; Agreed Facts ¶¶ 3–4.)

4. Before working at Brown, Ali was employed from 2001–2003 as an actuary at Governmental Risk Solutions ("GRS"), where he was responsible for pricing accounts and brokering some accounts. Before that he spent four years at Coregis Insurance ("Coregis"), where he became Pricing Leader, responsible for all actuaries and for pricing every account that Coregis wrote. He was also in charge of a product that involved taking larger risks and restructuring insurance needs by placing various kinds of reinsurance on behalf of the company. Coregis provided insur-

---

**1.** This Court has resolved all of the parties' evidentiary issues via a separate order.

ance exclusively for public entities. Ali began his career in insurance at Kemper, where from 1996–97 he was an actuarial associate, pricing large workers compensation accounts. (Ali Aff. ¶ 6)

5. When procuring insurance, a wholesale broker receives the customer's confidential information from the retail agent or other customer contact. That information may include such items as the insurance services contemplated, policy term, target price, expiring price, expiring coverage, description of operations, loss history, and exposures. After analyzing the information, the wholesale broker summarizes, assembles and provides the information to the insurance carrier based on its knowledge of the carrier and the customer. (Parker Decl. ¶ 6.)

6. After the wholesale broker learns that the carrier may be interested in insuring the customer, the broker analyzes the information provided by the carrier for the customer and then relays it to the customer. The information may be relayed in several different ways: it may come in the format of a formal proposal, or in the format of a bindable quote or a bindable carrier quote, or it may simply be conveyed over the phone or in an email. (Parker Decl. ¶ 6; Parker Test. at 73:03–74:01.)

7. The insurance industry is highly competitive and is relationship-driven. Brown treats its customer relationships as critical to its business and expends significant resources to develop, maintain, and expand these relationships. (Parker Decl. at ¶ 9; Parker Test. at 106:24–107:02; Ali Test. at 228.)

8. Brown invests in its relationships through the training and development of its brokers, and by reimbursing its brokers for customer-related expenses, including travel, meals, drinks, and sporting events.

(Parker Decl. at ¶ 10; Parker Test. at 106:10–23.)

9. Given the competitive nature of the insurance industry, Brown diligently protects its customer relationships, business interests, and confidences. Brown requires its employees to safeguard all such interests as a condition of their employment with Brown. The obligation to safeguard Brown's customer relationships, business interests, and confidences is mandated by Brown's Employee Handbook and the employment agreements it enters into with its employees. (Parker Decl. ¶¶ 11, 13–14; PX001; PX002; PX003; PX007; Bangloria Test. at 548:05–18; Rakowski Test. at 560:02–04; Caldwell Test. at 764:01–18.)

10. The customers of BBPES's Chicago office are the named insureds. If Brown loses a named insured, the excess premium necessarily is reduced, which in turn reduces revenue for the BBPES Chicago office. In contrast, the retail broker or administrator of an entity may change, but BBPES Chicago still may retain the entity initially associated with that retail broker or administrator as a customer. (Parker Test. at 103:12–104:03.)

11. In the case of a pool, the BBPES Chicago office's customer is the pool and its members. If Brown loses a pool or a member of the pool, the excess premium necessarily is reduced, which in turn reduces revenue for the BBPES Chicago office. (Parker Test. at 104:11–105:01; Ali Test. at 480:04–10.)

12. Brown's production reports note the revenue attributed to each customer, and the entities listed on the production reports as customers are the named insureds. (Parker Test. at 104:04–10.)

13. When Brown places one line of insurance for a customer, it attempts to expand the relationship and place additional

lines of insurance with that same customer. This was the practice of the BBPES Chicago office. Ali taught his employee James Parker ("Parker") to pursue additional lines of insurance with the same customer and specifically talked about this goal at Brown's Fall 2006 retreat. Ali also engaged in this practice. For instance, he expanded Brown's customer relationship with San Diego Schools Risk Management Joint Powers Authority ("JPA"). Brown initially placed only the buffer layer of worker's compensation coverage for the JPA, but expanded the relationship by negotiating a deal for the JPA's statutory layer of worker's compensation. (PX064; PX245; Parker Test. at 107:19–108:10, 108:22–109:07, 114:03–18; Caldwell Test. at 763:14–23.)

14. Selling additional lines of insurance to customers is something brokers know to do instinctively because brokers always want to grow their business by obtaining additional lines of business from current clients. (Parker Test. at 108:22–109:07; Caldwell Test. at 763:14–23.)

15. One of the reasons Brown invested substantial sums of money in customer entertainment and allowing brokers to attend conferences with clients was to develop customers relationships so that Brown could obtain additional lines of business from its customers. (Parker Test. at 108:11–21; Caldwell Test. at 763:14–23.)

## II. Ali's Employment With Brown

16. As a condition of his employment, Brown required Ali to enter into a Employment Agreement with Brown that included customer non-solicitation, employee no-hire, and confidentiality provisions. (Parker Decl. ¶ 13; PX001; Ali Test. at 146:01–23, 151:02–152:10; Caldwell Test. at 764:08–18; Agreed Facts ¶ 10.)

17. The confidentiality provision in Ali's Employment Agreement provides:

Employee recognizes and acknowledges that the confidential Information (as hereafter defined) constitutes valuable, secret, special, and unique assets of Company. Employee covenants and agrees that, during the term of this Agreement and for a period of two (2) years following termination of Employee's employment with the Company for any reason (whether voluntary or involuntary), Employee will not disclose the Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose without the express written approval of Company and will not use the Confidential Information except in Company's business. It is expressly understood and agreed that the Confidential Information is the property of Company and must be immediately returned to Company upon demand. The term 'Confidential Information' includes all information, whether or not reduced to written or recorded form, that is related to Company and that is not generally known to competitors of the Company nor intended for general dissemination, whether furnished by Company or compiled by Employee, including but not limited to: (i) lists of the Company's customers, insurance carriers, Company accounts and records pertaining thereto; and (ii) prospect lists, policy forms, and/or rating information, expiration dates, information on risk characteristics, information concerning insurance markets for large or unusual risks, and all other types of written information customarily used by Company or available to the Employee. Employee understands that it is Company's intention to maintain the confidentiality of this information notwithstanding that employees of Company may have free access to the information for the purpose of performing their

duties with Company, and notwithstanding that employees who are not expressly bound by agreements similar to this agreement may have access to such information for job purposes. Employee acknowledges that it is not practical, and shall not be necessary, to mark such information as 'confidential,' nor to transfer it within the Company by confidential envelope or communication, in order to preserve the confidential nature of the information."

(PX001).

18. The non-solicitation provision in Ali's Employment Agreement provides:

> For a period of two (2) years following termination of Employee's employment with the Company for any reason (whether voluntary or involuntary), Employee specifically agrees not to solicit, divert, accept, nor service, directly or indirectly, as insurance solicitor, insurance agent, insurance broker, insurance wholesaler, managing general agent, or otherwise, for Employee's account or the account or any other agent, broker, or insurer, either as officer, director, stockholder, owner, partner, employee, promoter, consultant, manager, or otherwise, any insurance or bond business of any kind or character from any person, firm, corporation, or other entity, that is a customer or account of the Company during the term of this Agreement, or from any prospective customer or account to whom the Company made proposals about which Employee had knowledge, or in which Employee participated, during the last two (2) years of Employee's employment with Company. For purposes of this Agreement, Employee acknowledges that informing existing clients or prospects that Employee is or may be leaving Company prior to leaving employment of Company shall

be deemed to constitute prohibited solicitation under this Agreement.

(PX001.)

19. The no-hire provision in Ali's Employment Agreement provides: "Employee agrees that Employee will not, for a period of two (2) years following termination of Employee's employment with Company for any reason (whether voluntary or involuntary), directly or indirectly solicit or seek to induce any of the Company's employees to leave the Company's employ for any reason, including, without limitation, to work for Employee or any other competitive company." (PX001.)

20. The Employment Agreement also prohibits Ali from "Organizing Competitive Businesses" and provides: "Employee agrees that so long as Employee is working for Company, Employee will not undertake the planning or organizing of any business activity competitive with the work Employee performs." (PX001.)

21. Ali's Employment Agreement also provides: "In the event of a dispute concerning the terms of this Agreement, or arising out of the employment relationship created by this Agreement, the prevailing party shall be entitled to recover, in addition to any other remedy obtained, (a) all attorneys' fees incurred in the investigation and preparation of issues for trial and in the trial and appellate proceedings, and (b) costs and expenses of investigation and litigation, including expert witness fees, deposition costs (appearance fee and transcript charges), injunction bond premiums, travel and lodging expenses, arbitration fees and charges, and all other reasonable costs and expenses." (PX001.)

22. Ali never tried to revoke the Employment Agreement or to renegotiate it. (Ali Test. at 150:17–19.)

23. As a condition of his employment, Brown also required Ali to agree to the

Employee Handbook, which specifically states that he will have access to highly confidential company information and charged him with the responsibility of keeping such information confidential. (Parker Decl. ¶ 14; PX002; PX003; PX007; Agreed Facts ¶¶ 8–9.)

24. Brown invested substantial resources in employing Ali, including paying him a salary and bonuses, which exceeded $500,000 in his last year of employment, paying him for his travel and entertainment business expenses, which exceeded $115,000 in his last year of employment, providing him with a laptop, paying for his cell-phone services, and providing him with an office and administrative personnel to support his work. (Parker Decl. ¶¶ 12, 19–20; Ali Decl. ¶ 27.)

25. As a Profit Center Leader, one of Ali's goals was to grow the profitability of the Chicago BBPES office, as the more profitable his office was, the more money he personally would earn. The profit margin of Ali's office was in excess of 35 percent. (Snearer Decl. ¶ 6; PX012; Ali Test. at 153:06–19, 289:05–290:03; Agreed Facts ¶ 20.)

26. While working for Brown, Ali supervised the work of Chicago BBPES office employees, including Parker, Hasib Bangloria ("Bangloria"), and Tracy Rakowski ("Rakowski"). Rakowski worked for Brown from approximately October 2004 through May 2007. Bangloria worked for Brown from December 2003 to April 2007. Parker began working for Brown in 2001 and still is a Brown employee. (Parker Decl. ¶ 3; Rakowski Decl. ¶ 4; Bangloria Test. at 548:02–04, 549:06–18, 550:14–18.)

27. Given his position as a Profit Center Leader, Ali also worked with Brown employees in other offices, including Kevin Cothron ("Cothron"), Doug Childers Sr. ("Childers Sr."), and Shane Caldwell ("Caldwell"). Caldwell, who worked for Brown from January 1, 2000, to February 9, 2007, had some supervisory responsibility over the BBPES Chicago office. Cothron worked for Brown from approximately September 2001 to February 2007. Childers Sr. terminated his relationship with Brown in February 2007. (Parker Decl. at ¶¶ 15, 43; Cothron Decl. at ¶ 5; Caldwell Decl. at ¶¶ 8–9, 28; Ali Test. at 145:06–13, 253:17–25, 254:04–13; Cothron Test. at 657:07–09, 664:18–19; Caldwell Test. at 689:04–14.)

28. On February 25, 2007, Ali resigned from Brown, and his last official day with the company was March 9, 2007. (Parker Decl. at ¶ 24; Ali Aff. ¶ 29; Ali Test. at 145:17–19.)

29. Ali resigned from his job when his first child was due in a couple of weeks; at trial he claimed that he had no other job lined up at that time. (Ali Test. at 255:17–256:05.) Based on the evidence in this case and Ali's demeanor on the stand, the Court does not find Ali's testimony credible. Instead, the Court finds that Ali, along with other former Brown employees, was planning to create an insurance company called Accretive that would compete with Brown.

### III. The San Diego JPA

30. The San Diego County Schools Risk Management Joint Powers Authority, or "JPA," is a legal entity. It is an insurance pool whose members are various public school entities located in San Diego County, California. The pool addresses its members' insurance needs as a group, which potentially results in costs savings. (Ali Aff. ¶ 17; Starich Dep. 15–16:17–5.)

31. Since 1994, the JPA has used John Burnham Insurance Services, now known as Union Bank Insurance Services ("Burnham"), as its retail broker. (Starich Dep.

13–14:22–2, 18–19; 17:7–10.) John Starich ("Starich") of Burnham has worked on the JPA account since 1994. (Starich:14:18–19.)

32. Ali has worked with Starich on various JPA lines of coverage since the late 1990s, when he was employed at Coregis. (Starich Dep. 19:14–17; 20:3–7; 148:2–7; Keller Aff. ¶ 14; Ali Aff. ¶ 17.) After joining GRS in 2001, Ali continued to work with Starich on JPA business, both on those that GRS succeeded in placing and on proposals for other lines of coverage, including workers' compensation. (Ali Aff. ¶¶ 6, 20.)

33. During Ali's employment at Brown, Starich selected Brown to place the workers' compensation line of coverage for the JPA. (Ali Aff. ¶ 22.) Starich chose Brown's services as a wholesale broker because of Ali, who Starich found to be "a very intelligent, almost brilliant individual." (Starich Dep. 33:17–21; 52–53:17–10.) Starich viewed Ali as a broker who "does extensive review of actuarial reports and does extensive data manipulation of various loss data" which is not typical of a wholesale broker. (Starich 61:9–16.)

34. While Ali worked for Brown, Brown was the wholesale broker of record for the JPA. Ali negotiated a contract for the JPA in 2003 with Liberty Mutual regarding its buffer workers' compensation coverage. In 2006, he negotiated another contract for the JPA with Liberty Mutual for buffer workers' compensation, which was renewable annually for a period of three years. (Parker Decl. at ¶ 23.)

35. Under the 2006 three-year arrangement with Liberty Mutual, the policies were issued annually, subject to renegotiation. This contrasted with the 2003 contract, which bound both the carrier and the JPA for three years. (Starich Dep. 78:8–24; Levine Decl. ¶ 6; Ali Test. 285–86:21–29.)

36. The JPA was one of the largest customers of the Chicago BBPES office during Ali's employment and accounted for approximately $600,000 in revenue during the 2006–07 policy term. (Parker Decl. at ¶ 21; Snearer Decl. ¶ 6; PX012; PX128; Parker Test. at 105:02–17; Ali Test. at 289:05–290:03; Agreed Facts ¶¶ 19–20.)

37. Just before Ali left Brown, Brown secured a two-year excess insurance policy for the JPA from Safety National, which would have brought Brown another estimated $170,000 in revenue annually. (Parker Decl. at ¶ 21; PX255; PX256.)

38. In January or February 2007, Ali informed Starich that he was unhappy and might leave Brown. Similarly, Ali contacted Gene Levine ("Levine") of Liberty Mutual and informed him that he was resigning from Brown. Levine was surprised to hear this because in his dealings with Ali, Ali had never indicated he was unhappy at Brown. (Levine Decl. ¶ 7; Starich Dep. at 69:24–70:02.)

39. During the week of February 26, 2007, after Ali announced his resignation, he spent two days in meetings with Powell Brown and Brown employee Karl Snearer ("Snearer"), who was going to replace Ali. (Ali Aff. ¶ 31; Snearer Decl. ¶¶ 3–5, 8.) Ali informed Powell Brown and Snearer that the JPA account was possibly in jeopardy due to his departure. (Snearer Decl. ¶ 8.)

40. A few weeks later, Snearer met with Starich in San Diego in an attempt to keep the JPA account. (Snearer Test. 580:4–6; Snearer Decl. ¶ 11; Bangloria Aff. ¶ 22; Starich Dep. 90–91:18–14.) Starich told Snearer that without Ali's involvement, he would not keep the JPA account with Brown. (Starich Dep. 91–93, 99:9–16; Snearer Test. 589:5–9.)

41. Following the meeting, Snearer and Ali had a series of discussions regard-

ing Brown providing Ali with a fee in exchange for his continued work on the JPA account. Ali first proposed to Snearer that he receive 90% of the profits earned on the account. This was such a high demand that Snearer did not feel comfortable taking it back to Powell Brown. Snearer was prepared to accept something in the 50/50 range, but Ali's final offer was to take 88% of the profits and give Brown 12%. Contrary to Ali's testimony, the Court finds that Ali never proposed an agreement whereby Ali would retain 60 percent and Brown 40 percent. The Court credits Snearer's testimony that if Ali had proposed such an agreement he would have taken the proposal back to Powell Brown and tried to make it work. (Snearer Decl. ¶ 14; Ali Test. at 291:25–292:22; Snearer Test. at 602:09–23, 603:01–15, 603:21–604:16.)

42. During their negotiations, Ali pressured Snearer, telling him that Brown would lose its position as the broker of record unless Brown agreed to a deal with him. Ali also informed Snearer that he would rather see someone else get the JPA account and risk losing it permanently than see Brown benefit from the JPA account. (Snearer Decl. ¶¶ 14–15.)

43. Because Ali's final offer was still too high in Snearer's view, he ended his negotiations with Ali regarding the JPA. Snearer did not authorize Ali to do any further work on the JPA account. (Snearer Decl. ¶ 14; Snearer Test. at 596:24–597:01.)

44. During this period, Ali and Starich privately discussed what wholesale broker should replace Brown as the broker of record for the JPA. Starich attested that he and Ali agreed that GRS would be a "good option" in part because "Ali had a good relationship with GRS." Despite Starich's sworn statement, Ali claims that did not recommend GRS for the broker of

record position. (PX013; Starich Dep. at 103:09–104:10; Ali Test. at 295:23–297:01.) Based on the evidence and Ali's demeanor on the stand, the Court does not find his testimony credible, and instead credits the testimony of Starich.

45. Levine of Liberty Mutual met with Snearer in early April 2007, after Ali's departure. Levine assumed that Brown would remain as the wholesaler broker of record for the JPA and that Bangloria would handle the renewal. (Levine Decl. ¶ 10.) However, Bangloria's role on the JPA account up to that point had been largely clerical in nature. (Starich Dep. 91; Bangloria Aff. ¶ 22.)

46. On April 3, 2007, the JPA and Starich terminated Brown's position as the wholesale broker of record for workers' compensation and issued a letter transferring the position to GRS. The letter transferred the three-year Liberty Mutual buffer workers' compensation coverage and the two-year Safety National excess workers' compensation coverage from Brown to GRS. (Parker Decl. at ¶ 25; Snearer Decl. ¶ 17; PX029; Keller Test. at 325:16–326:11; Agreed Facts ¶ 23.)

47. On April 4, 2007, Starich contacted Levine and informed him that Ali was "authorized by us to provide any necessary assistance to you, and to negotiate with you on our behalf, in developing the rate proposal for that term." Starich was hoping for a 2% decrease in premium from Liberty Mutual rather than the 2% increase in premium called for in the contract. Levine subsequently forwarded that message to his boss, and noted that the JPA had "appointed Mun Ali [as] a consultant." (Parker Decl. at ¶ 27; Levine Decl. ¶ 12; PX030; Starich Dep. at 119:17–22; Ali Test. at 297:21–25; Agreed Facts ¶ 25.)

48. At some point before this appointment, Levine specifically told Ali that he would not be able to speak with him about the JPA renewal unless he was the broker of record or had been appointed as a consultant with authorization to deal on behalf of the JPA. (Levine Decl. ¶ 12.)

49. On April 6, 2007, pursuant to the JPA's designation of Ali as a consultant, Levine contacted Ali to obtain certain information about the JPA that was necessary in order for Liberty Mutual to create a formal quote. Levine believed that Ali had the same level of authority as GRS to negotiate on behalf of the JPA. (Levine Decl. ¶¶ 12–13; PX031.)

50. On that same day, Ali and Bangloria were scheduled to come to Liberty Mutual's office to discuss business, although Levine could not recall whether he actually met with them. At that point, Bangloria was still a Brown employee, with a Brown Employment Agreement that contained the same prohibitions as Ali's. (Levine Decl. ¶ 15; Parker Decl. ¶ 13; PX001; PX033; Bangloria Test. at 548:02–18; Snearer Test. at 596:24–597:01.)

51. Ali subsequently negotiated with Levine regarding the rate reduction that the JPA desired. Levine remembers speaking with Ali about the rate reduction sometime in the middle of April. (Levine Decl. ¶ 16.)

52. By April 20, 2007, Ali completed his negotiations with Levine regarding the rate reduction for the JPA, and Levine sent an email to Ali and GRS confirming the rate reduction for the Liberty Mutual policy. (PX034; Keller Test. at 360:02–12; Levine Decl. ¶ 17.)

53. The same commitment letter Brown had received from Safety National was used to finalize the two-year Safety National policy for the excess workers' compensation coverage. (PX255; PX256.)

54. By July 1, 2007, the Liberty Mutual and Safety National workers' compensation policies for the JPA were bound with GRS as the broker of record instead of Brown. (PX029; Keller Test. at 354:11–355:11.)

55. Ali did not receive any compensation or other consideration for helping the JPA obtain a rate reduction for the 2007–08 renewal. (Levin Decl. ¶ 20; Ali Aff. ¶ 43; Starich Dep. 160:12–20; Keller Aff. ¶ 25.)

56. Starich acknowledged that the actions taken by Ali on behalf of the JPA—his communications with Liberty Mutual about the rate reduction—are typically the responsibility of the wholesale broker of record. If the wholesale broker, like Keller, had contacted the carrier as Ali did, Starich would consider that "servicing" the JPA as part of the wholesale broker's duties. (Starich Dep. at 121:04–13, 171:03–11.)

57. According to Keller of GRS, it is "atypical" for one broker to negotiate with the carrier when a different broker is the broker of record. According to Keller, the work Ali did on behalf of the JPA at that time is the work of a broker and is partly how the broker earns a commission. (Keller Test. at 341:18–342:03, 342:08–343:07.)

58. Keller was surprised to learn that Ali was doing such work for the JPA. He asserts that he would have been able to handle the rate reduction and was surprised to hear that Ali, in a sworn declaration submitted to the Court, stated that Keller was not up to speed on the JPA's needs and would not have been able to handle the rate negotiation. (Ali Aff. ¶ 41; Keller Test. at 329:10–330:23, 342:04–07.)

59. Ali admits that negotiating a rate reduction is something that the wholesale

broker of record ordinarily does. (Ali Test. at 298:07–12.)

60. Keller received the following compensation in his role as the broker of record for the JPA: (1) for the Liberty Mutual policy, 2007–2008—$545,000 and 2008–2009—$420,000; and (2) for the Safety National policy, 2007–2008—$133,000 and 2008–2009—$128,000. (Keller Aff. ¶¶ 34–35.)

## IV. The New Jersey Pools

61. While employed by Brown, Ali also placed insurance coverage for the New Jersey insurance pools/trusts of School Alliance Insurance Fund ("SAIF"), School Excess Liability Joint Insurance Fund ("SEL"), Public Alliance Insurance Coverage Fund ("PAIC"), and Diploma Joint Insurance Fund ("DIP"). (Parker Decl. ¶ 29; PX038; Young Test. at 617:14–618:01; Agreed Facts ¶ 28.)

62. A company called Public Entity Group Administration Services, Inc. ("PEGAS") administers the pools/trusts of SAIF, SEL, PAIC, and DIP. PEGAS contracts out some of its duties to another company, Risk ·& Loss Managers, Inc. ("RLM"). Willard Young ("Young") of PEGAS is responsible for, among other things, procuring insurance and reinsurance coverage for the New Jersey pools/trusts. (Parker Decl. ¶ 29; Young Test. at 613:25–615:05; Agreed Facts ¶ 29.)

63. SEL/SAIF/DIP, along with the JPA and the Preferred Governmental Insurance Trust ("PGIT"), an insurance pool for governmental entities administered by Brown, were the largest customers of the Chicago BBPES office during Ali's employment. (Parker Test. at 105:05–08, 105:13–17.)

64. Ali was the primary contact for SAIF, SEL, PAIC, and DIP, and he supervised the work of Rakowski and Ban-

gloria related to those customers. (Parker Decl. ¶ 30.)

65. Caldwell introduced Ali to Young of PEGAS sometime around 2003. (Ali Aff. ¶ 55; Young Test. at 615:06–14.)

66. Since the introduction, Ali and Young have developed a close relationship. Ali considers Young a mentor and second-father figure, and Young considers Ali a friend and a "consummate professional." They have a mutual friendship and their families vacation together. Young testified at trial in Ali's defense. (Young Test. at 615:19–616:19, 617:04–08.)

67. Young considers Ali one of the "most knowledgeable professionals in the procurement of reinsurance for public entity insurers" in the country. Ali gives Young "professional advice" at times. (Young Test. at 616:14–16, 616:24–617:03.)

68. Ali informed Young that he was leaving Brown to set up his own insurance brokerage company that specializes in public entity insurance sometime during the "late winter" before he left Brown. (Young Test. at 619:02–07, 619:10–18.)

69. After Ali left Brown, in February or March 2007, Young approached Ali and asked him to help on workers compensation and excess property lines of coverage for SEL. Young provided Ali with the information required to create submissions. (Ali Aff. ¶ 54; Young Test. at 620:05–11.)

70. Ali created submissions to carriers regarding the insurance coverage for SEL, and subsequently made proposals to Young for that coverage. (Young Test. at 620:09–17; PX045.)

71. Ali admitted speaking with SEL, SAIF, and DIP about their insurance coverage and working on proposals for them after he left Brown and while he was working for Accretive. (Parker Decl. ¶ 31; PX012; PX024; Ali Test. at 362:11–363:12.)

72. Bangloria admitted helping Ali service SEL, SAIF, and DIP after Ali left Brown. Bangloria was on Brown's payroll at the time, but performed work relating to SEL, SAIF, and DIP at Ali's request. (PX045; Bangloria Test. at 551:04–552:04.)

73. Young admitted at trial to Ali's work relating to SEL, SAIF, and DIP while Ali worked for Accretive. However, during his deposition in August 2008, Young denied that Ali had performed any work for SEL, SAIF, and DIP after joining Accretive. (Young Test. at 620:09–17, 620:21–622:12.)

74. In late March 2008, Selective Insurance ("Selective") withdrew its renewal quote for a portion of SEL's coverage. Selective indicated that the withdrawal was necessary due to difficult market conditions. (Young Test. at 624:19–25, 625:18–19.)

75. The withdrawal put Young in a "hard spot." (Young Test. at 625:18–24.)

76. After receiving notice from Selective, Young called Ali, who was then working at Accretive, seeking his "professional opinion." Young told Ali that Selective had withdrawn its renewal quote, and that Selective had used market conditions as the reason for the withdrawal. Young was unsure whether those conditions really justified the withdrawal of the renewal quote, so he called Ali to find out what was going on in the market. (Ali Test. at 399:11–400:12; Young Test. at 625:25–626:17.)

77. Specifically, Young asked Ali if the flood insurance issues that Selective had cited as the principal reason for withdrawing the renewal quote were legitimate. Ali responded that it was a soft market and that Young should have no problem replacing the business with other carriers. (Ali Test. at 400:13–17; Young Test. at 626:18–22, 627:05–13.)

78. Young then asked Ali his opinion of several carriers and which carriers he could replace Selective with. One of the carriers Young asked about was ACE Insurance Company ("ACE"), and he asked whether ACE was a "good market" for him to consider. Ali told Young that ACE was a good market because they wrote a lot of public entity business. (Ali Test. at 401:14–402:22; Young Test. at 627:14–628:03.) Young then confirmed with Ali that Rich Vincelette ("Vincelette") was the person he should call at ACE. (Ali Test. at 402:23–403:01; Young Test. at 628:04–06.)

79. After Young spoke with Ali, Ali contacted Vincelette about SEL. Vincelette writes a portion of the insurance for the Florida Insurance Trust that Ali's new company Accretive created. Ali and Vincelette communicate via email or over the telephone a couple of times a week. (Young Test. at 628:18–629:11; Vincelette Dep. 11:15, 15:05–10, 22:18–19, 22:24–23:06, 25:19–22, 26:03–04.)

80. Prior to 2008, Vincelette had not attempted to write the lines of coverage that Selective wrote for SEL because one of PEGAS's partial owners, William Rue ("Rue") and his company Rue Insurance, owned a substantial amount of stock in Selective Insurance, and therefore Vincelette thought that it was unlikely that PEGAS would move the business from Selective to ACE. (Young Test. at 623:17–20, 623:24–25; Vincelette Dep. 31:09–25, 32:01–15; 69:09–21; Rue Dep. 12:13–17, 13:07–15.)

81. Given Selective's relationship with SEL, Vincelette was "very surprised" to learn that PEGAS was considering replacing Selective as the carrier for SEL. (Vincelette Dep. 32:16–24, 33:15–17.)

82. After Vincelette heard from Young about the potential replacement, Vincelette spoke with Ali about ACE acting as SEL's insurer because of Ali's experience with

SEL and because Ali knew Young. Vincelette knew that Ali and Young were friends and that Ali had a much closer relationship than he did with Young. Vincelette asked Ali if he felt PEGAS was serious about replacing Selective with ACE, and Ali responded that if Young said so, they were probably serious about moving the account. (Ali Test. at 403:12–404:01; Vincelette Dep. 34:03–17, 34:25–35:14, 36:14–18, 42:21–43:20, 44:14–20.)

83. Ali later told Vincelette that he had spoken with Young and confirmed that PEGAS was serious about switching SEL's insurance carrier from Selective to ACE. (Vincelette Dep. 41:15–42:06, 42:21–43:02.)

84. Thereafter, ACE supplied Young with a quote. (Young Test. at 629:12–13.)

85. During a management meeting of PEGAS in which the change in insurance coverage for SEL was discussed, Young told management that he previously "consulted" with Ali regarding the insurance placement for SEL. (Young Test. at 632:14–633:10.)

86. As of July 1, 2008, ACE began writing the first layer of insurance coverage, the risk transfer for auto liability and general liability, and the supplemental worker's compensation insurance, for SEL. (Young Test. at 622:18–623:07, 629:21–22; Vincelette Dep. 29:03–21; 30:07–15.)

87. The new lines of coverage ACE began writing for SEL, effective July 1, 2008, amounted to roughly $2.75 to $3 million in gross premium, which Vincelette considered a "nice expansion of an existing account." (Vincelette Dep. 30:16–19, 31:02–08.)

88. Around the same time, Young terminated Brown's position as the broker of record for SEL and informed Ali of this termination because he thought Ali would like to "gloat." Ali laughed upon hearing that Brown had been replaced as the broker of record. (Ali Test. at 406:08–407:11; Young Test. at 636–638:09.)

## V. Brown's Florida Non–Profit Pool

89. Prior to leaving Brown, Ali was involved in a strategic initiative by Brown to form and administer an insurance trust/pool dedicated to non-profit entities in the state of Florida. Ali was among the members of the executive team leading Brown's Florida non-profit initiative and headed the Chicago team working on the non-profit initiative. (Parker Decl. ¶¶ 32, 34; Ali Test. at 154:04–06; Cothron Test. at 658; Caldwell Test. at 753:01–05.)

90. The Florida non-profit trust would create another stream of revenue for Brown, and Brown executives were excited about the non-profit opportunity. (PX070; Ali Test. at 153:16–154:03; Cothron Test. at 663:22–664:05; Caldwell Test. at 719:06–09.)

91. Brown did not share its plans for the formation of the non-profit trust with any competitors. Brown's communications within the company about Brown's strategy for forming the non-profit trust were confidential, and Brown employees understood that they could not disclose Brown's strategy and plans for forming the non-profit trust with a competitor. (Cothron Test. at 663:22–664:17.)

92. Brown's efforts included: expending substantial resources researching those things that would be necessary to establish a non-profit pool in Florida; lobbying for the legislation to authorize the formation of the pool; identifying potential pool members; determining the various carriers' "appetites" for the pool; and facilitating relationships with prospective pool members. (Parker Decl. ¶ 33.)

93. Brown planned for Ali's BBPES Chicago office to act as the wholesale bro-

ker for the Florida non-profit pool. Ali "jumped" at the opportunity to place the insurance for Brown's non-profit pool, since he felt he could put a substantial amount of money in his own pocket if he were to act as the broker. (Cothron Decl. at ¶ 20; Parker Test. at 122:04–07; Ali Test. at 161:05–14.)

94. Powell Brown sought Ali's assistance with the non-profit initiative. In February 2006, Powell Brown asked Ali for his thoughts on how to gather information about the non-profits located in Florida. A day later, Ali responded with four different approaches to gather such information and indicated that he could discuss them further the next day. The following day, Ali asked some of his BBPES Chicago employees to review information, so that they could discuss it. (PX071; Ali Test. at 163:06–13, 164:07–14.)

95. Ali later provided Powell Brown with a list of specific classes of business that would be prospective targets for the non-profit trust in Florida. (Parker Decl. ¶ 38; PX093.)

96. On May 24, 2006, Ali forwarded Powell Brown an outline of how he would like to see the Brown non-profit initiative progress. The "Florida Non Profit" outline, detailed, in Ali's own words, "how we would like to see this project move forward along with suggested responsible office." Ali suggested that seven out of the twelve enumerated steps should be handled by his office. (Parker Decl. ¶ 38; PX093; Ali Test. at 170:13–177:08, 223:19–22.)

97. When an insurance company is trying to form a pool like the Florida non-profit pool, the relationship between the wholesale broker and the carrier is critical. (Parker Test. at 119:05–19.)

98. Ali's BBPES Chicago office engaged in a series of conversations with Vincelette from ACE, an insurance carrier with which Brown had a relationship, to determine its potential interest in working with the pool and the types of risks that it would be willing to cover. Ali led those conversations, and Parker assisted him. (Parker Decl. ¶ 36; PX232; Parker Test. at 131:15–25.)

99. At one point in late 2006/early 2007, shortly before Ali left Brown, Ali prohibited Parker from contacting ACE about the Florida non-profit pool without his knowledge. (Parker Decl. ¶ 36; Parker Test. at 132:01–133:24.)

100. Ali, Caldwell, and Powell Brown met with Vincelette of ACE to discuss ACE's interest in becoming a carrier for Brown's non-profit trust. (Caldwell Test. at 713:01–09.)

101. Ali and the rest of the Chicago team used their prior experience with forming and servicing a non-profit trust in Washington as the launching pad for the Florida non-profit pool. They gathered critical information from the Washington program so they did not have to start from scratch when contemplating underwriting guidelines, policy forms, and carrier preferences/appetites for the Florida non-profit trust. (Parker Decl. ¶ 35; PX086; PX094; PX0254; Parker Test. at 78:20–79:17.)

102. By June 27, 2006, Ali and his team had created the first draft of the Florida non-profit underwriting criteria. (PX234; Ali Test. at 214:25–215:16.)

103. Brown also surveyed its retail operations in Florida, gathered detailed confidential information regarding their existing books of non-profit business, and transmitted that information to Ali and others on the Chicago team. (Parker Decl. ¶ 37.)

104. Kurt Heyman ("Heyman"), a Brown employee in Florida, contacted various non-profits regarding their interest in

becoming members of Brown's non-profit trust. He then reported his efforts to the others on the team. (Cothron Test. at 663:06–13; Caldwell Test. at 721:14–17.)

105. Brown employees also contacted retail agents about moving their business into Brown's non-profit trust. (Cothron Test. at 663:14–19; Caldwell Test. at 716:17–24, 758:06–11.)

106. Because some of the retail brokers were reluctant to provide Heyman and the BBPES Chicago office with confidential information about their non-profits, Caldwell asked Powell Brown to intervene and to directly ask those retail brokers to provide the information. (Parker Test. at 122–24; Caldwell Test. at 758:06–22.)

107. By Spring 2006, Brown had amassed a good portion of the needed information for its non-profit pool. On March 16, 2006, Heyman emailed Caldwell, Powell Brown, and others a summary of the non-profit business within Brown's retail system. The e-mail describes a prior meeting with Mid Florida Community Services, Inc. ("Mid Florida"), noting that Childers Sr. serves on the board of a Community Action Agency and that Brown employees Mike Scholl ("Scholl") and Heyman previously met with the chairman of that organization, who indicated that he was more than willing to assist in Brown's efforts. (DX35; Caldwell Test. at 750:10–23, 751:01–08.)

108. After receiving the March 16, 2006, email detailing Brown's retail non-profit business, Caldwell forwarded the email to Ali. Caldwell also updated Ali verbally regarding the progress of the non-profit proposal on a regular basis. (DX35; PX074; Ali Test. at 231:20–232:05, 233:01–20, 234:08–10, 237:19–239:21; Caldwell Test. at 752:17–754:03.)

109. Caldwell took an active role in creating PowerPoint presentations regard-

ing Brown's proposed non-profit pool. On May 18, 2006, for example, an employee of Brown's creative department sent an email to Heyman and Scholl on Caldwell's behalf. The email notes that Caldwell wanted Heyman and Scholl to add more content to certain sections of the non-profit pool PowerPoint presentation. (PX087; Caldwell Test. at 723:21–725:03, 725:08–11.)

110. Ali was charged with the task of analyzing confidential information received from Brown retail agents and affiliates in Florida regarding Brown customers that would be potential members of the fund, specifically, examining the customers' risk profiles and the nature and cost of their current insurance portfolios to determine how a pooling arrangement might benefit them. (Parker Decl. ¶ 37; Parker Test. at 129:22–130:25; Ali Test. at 183:15–18, 184:13–24.)

111. To perform this work, Ali received detailed confidential information regarding Brown's non-profit business in Florida. (Parker Decl. ¶ 37.)

112. For example, on May 17, 2006, Parker sent to Ali and others a document containing the names of non-profit entities for which Brown's Daytona Florida office placed worker's compensation insurance, their effective dates, premiums, payroll numbers, and other confidential information. (Parker Decl. ¶ 38; PX084.)

113. On June 16, 2006, Patricia Adams of Public Risk Underwriters ("PRU"), a Brown entity in Florida, sent Ali an email with an attached zip file called "B & B and Other Offices–Applications Completed.zip." The subject of the email was "Not For Profit Applications and Prospect Info," and the zip file contained hundreds of pages of confidential information on numerous prospects for Brown's non-profit pool in Florida, including Brown customers Agency for Community Treatment Services, Brook-

wood Florida–Central, Inc., Brookwood Florida–East, Inc., Lake Community Action Agency, and Mid Florida. The information gave Brown a roadmap of the types and sizes of the non-profits that would be members of the Brown non-profit trust and the premium amounts that would be at issue. (Parker Decl. ¶ 38; PX095; Parker Test. at 125:11–126:24; Ali Test. at 188–89.)

114. Ali admits that he received this email, that it would be something he should look at as part of his job, and that it is "very probable" that he did review, but he claims to have "no active recollection" of reviewing the email. He also claims not to recall doing anything with the email, PX095, after he received it, but admitted that the documents produced during discovery suggest that he may have taken some affirmative action after receiving the email, such as forwarding it on to be put in a shared drive. (Ali Test. at 188–92.) Based on the evidence and Ali's demeanor on the stand, the Court does not find credible his claimed lack of memory regarding this document.

115. On June 16 and June 18, 2006, someone using Ali's user account, "mali," saved the zip file "B & B and Other Offices–Applications Completed.zip" (attached to PX095), to the hard drive of Ali's laptop. Someone using Ali's "mali" user account took an affirmative action twice in connection with the PX095 zip file in order to save it to the laptop hard drive two different times. Ali claims that he does not recall whether he saved this document to the hard drive. (PX095; Karchmer Decl. ¶ 3a; Ali Test. at 192:24–193:03; Karchmer Test. at 506:24–507:25; 509:05–20.) Based on the evidence and Ali's demeanor on the stand, the Court does not find his claimed lack of memory credible.

116. Despite his prior assertions that he did not know how to open a zip file, Ali did not need any special knowledge to be able to open the zip file. The operating system on Ali's laptop, Windows XP, automatically opens zip files when a user double clicks on them. (Karchmer Decl. ¶ 5; Karchmer Decl. Ex. A; Karchmer Test. at 510:10–521:03.)

117. On June 19, 2006, Bangloria circulated a file path to several Brown employees, including Ali and Parker, which led to a file on Brown's network containing a list of Florida non-profit prospects about which Brown had compiled application data, along with their Federal Employer Identification Numbers, and the Brown retail office that placed insurance for that entity. Among the names on this list were Lake Community Action Agency, Brookwood Florida–Central, Agency for Community Treatment Services, Indian River County Council on Aging ("Indian River"), and Mid Florida. (Parker Decl. ¶ 38; PX101; Parker Test. at 127:17–129:21; Ali Test. at 201:12–17, 383:02–385:08.)

118. On June 19, 2006, Patricia Adams sent Ali another email entitled "Additional Applications for Not for Profit Prospects." Attached to this email was application data on a number of other Florida non-profits identified as prospects for the trust, including Indian River (now known as Senior Resource Alliance), along with a spreadsheet containing the names and contact information for every member of PGIT, a governmental entity pool administered by Brown. (Parker Decl. ¶ 38; PX106; Ali Test. at 193:04–05, 193:12–14, 388:20–389:07.)

119. On June 20, 2006, Ali instructed Parker, Bangloria, and another employee to gather all the data for the non-profit entities submitted to the BBPES Chicago office by Brown offices in Florida. The next day, one of Ali's employees noted in an email that all submitted non-profit ac-

counts had been printed. (PX111; Ali Test. at 210:04–211:06, 211:22–212:07.)

120. Although he received information about Brown's non-profit entities on multiple occasions and even directed his employees on how to organize the materials, Ali claims that he has "no active recollection" of reviewing any of the information received about the Florida non-profits. When pushed for a more precise answer, Ali testified that he may have or may not have looked at the information. (Ali Test. at 212:17–23.) Based on the evidence and Ali's demeanor on the stand, the Court does not find his claimed lack of memory credible.

121. Parker believes that Ali looked at and analyzed at least some of the confidential information that he received for Brown's pool. For instance, when Parker provided Ali with information from the Daytona office, Ali immediately noticed that the data was two years old and asked to see the more current data. Parker also recalls Ali talking to him generally about the non-profits referenced and specifically about some of the information received. (Parker Decl. ¶ 39; Ali Decl. ¶ 82; PX084; PX085; Parker Test. at 131:01–14; Ali Test. at 185:03–187:07.)

122. While working for Brown, Cothron assisted in Brown's efforts to form a non-profit pool by pursuing legislation in Florida that would allow for the formation of such a pool. Cothron personally contacted various public officials and their staff to get the non-profit pool legislation passed. Also, Brown's PRU office in Florida created a list of non-profits that would benefit from the non-profit legislation, and Cothron submitted that list to the Florida governor's staff in June 2006. (Cothron Test. at 658:18–659:11, 670:15–671:09).

123. Cothron kept others at Brown, including Ali, informed of his work relating to the non-profit pool. (Cothron Decl. at ¶ 19; PX100; PX112; Cothron Test. at 659:12–17, 659:23–661:11.)

124. Caldwell allocated lobbying costs for the proposed legislation between Ali's office, Cothron's office, and Heyman's office at the direction of Powell Brown. (Ali Test. at 168:15–170:12; 715:06–15; Caldwell Decl. ¶ 15.)

125. Various Brown employees spoke with the head of Mid Florida, Mike Georgini ("Georgini"), regarding Mid Florida becoming one of the founding members of Brown's non-profit pool, and also about Georgini serving on the board of Brown's pool and showing his support for the non-profit legislation for which Brown was lobbying. Georgini first learned of the concept of a non-profit insurance pool from Brown during a meeting that Childers Sr. set up in Leesburg, Florida, which Heyman and other Brown employees attended. Childers Sr. facilitated this meeting because he was on the Board of Directors of Mid Florida. (PX070; PX103; Georgini Dep. at 14:08–10, 17:06–09, 21:06–08, 34:19–35:13, 36:24–37:06, 37:13–19, 38:04–39:13, 39:25–41:04, 41:08–12, 42:21–43:10, 45:02–08, 109:15–18.; Cothron Test. at 662:01–04, 662:10–663:05, 679:17–25.)

126. Childers Sr. contacted former Florida Governor Jeb Bush on behalf of Mid Florida regarding the non-profit legislation. (PX108; Cothron Test. at 661:19–25; Caldwell Test. at 754:14–755:25.)

127. In June 2006, Governor Bush vetoed the proposed legislation that would have allowed for the establishment of Brown's non-profit pool. (Parker Decl. ¶ 40.)

128. After the non-profit legislation was vetoed in June 2006, Brown continued its efforts relating to the Florida non-profit pool with some employees learning more about the Washington non-profit pool, working on the non-profit class codes,

building up the computer system called Velocity, speaking with Vincelette of ACE in December 2006 and January 2007 about ACE's interest for insuring the non-profit pool, and continuing to work on getting the bill passed. (Parker Test. at 99:12–23, 117:07–119:02; Cothron Test. at 678–79.)

129. Brown employees Bill Kelly ("Kelly") and John Church ("Church") again spoke with Georgini regarding Mid Florida joining a potential non-profit trust as one of its founding members, and Georgini serving on the board. (Georgini Dep. at 33:14–34:18, 47:03–11, 47:15–48:07, 48:14–19; 50:21–52:15, 110:01–08.)

130. Brown also solicited Lifestream Behavioral Center, Inc. ("Lifestream") to become a founding member of its non-profit pool. Various Brown employees, including Heyman, Childers Sr., and Scholl, spoke with Lifestream's CEO, John Cherry ("Cherry"), regarding the non-profit legislation and Lifestream becoming a member of Brown's non-profit trust. (PX103; Cherry Test. at 428:18–20, 430:22–431:07, 431:19–23, 432:04–09.)

131. In addition, the Florida non-profit pool was discussed at the Fall 2006 retreat for BBPES Chicago employees; it was considered a viable opportunity, and the office estimated that it would bring in roughly $500,000 in revenue for that office. (PX064; PX245; Parker Test. at 111:01–113:08.)

132. In December 2006, members of Brown's PRU office contacted Vincelette regarding ACE acting as a carrier for Brown's proposed non-profit trust. (Caldwell Test. at 714:01–10.)

133. When Ali learned that PRU employees had contacted Vincelette directly, he was "very upset" because he thought that PRU was trying to cut him out of the non-profit pool opportunity and prevent him from being the wholesale broker. If

Ali were cut out, his office would lose the revenue and he in turn would lose money. Ali contacted his boss Powell Brown to complain about the situation. Ali then contacted Caldwell, forwarding him the email he had sent to Powell Brown. (PX117; Ali Aff. ¶ 87; Ali Test. at 226:18–228:25, 230:18–231:19, 234:11–235:22; Caldwell Test. at 714:06–715:05.)

134. On January 30, 2007, new Florida Governor Charlie Crist signed legislation allowing for the formation of insurance trusts for non-profit entities. (Parker Decl. ¶ 41.)

135. That same day, Cothron sent Ali and Caldwell an email announcing that the bill had been signed, but did not send a copy of this email to the other members of the Brown team who had been working on the initiative. (Parker Decl. ¶ 42; PX119; Ali Test. at 252:04–253:05.)

## VI. Formation of Accretive

136. Shortly after the non-profit bill passed in 2007, Ali, Caldwell, Cothron, and Childers Sr. terminated their employment with Brown. All of these individuals now work for Accretive Insurance Group ("Accretive") and its subsidiaries, which were formed by Caldwell in March 2007. (Parker Decl. ¶ 43; Ali Test. at 155:08–23.) Accretive is owned 100 percent by Caldwell. Accretive Insurance Agency and Non–Profit Insurance Services, Inc. ("NPIS") are wholly owned subsidiaries of Accretive. NPIS administers a Florida non-profit insurance trust like the one Brown had proposed. Accretive Insurance Agency is the wholesale broker that places the trust's excess insurance coverage. (Agreed Facts ¶ 30; Caldwell Decl. ¶¶ 4–5. 45; Ali Test. at 155:11–156:01; Caldwell Test. at 683:22–684:17; Ali Aff. ¶ 94.)

137. Caldwell resigned from Brown on February 9, 2007. He met with Powell Brown regarding his resignation that day,

but did not tell him that he intended to work with Ali, Cothron, and Childers Sr., or that he was going to form Accretive. (Caldwell Test. at 689:15–690:07.)

138. Caldwell claims that the primary purpose of forming Accretive was to acquire niche insurance companies, and yet as of time of trial Accretive had not acquired a single insurance company. Caldwell claims that the idea of forming a non-profit trust in Florida was an afterthought and not the main reason he created Accretive. However, Caldwell admits that Accretive had begun work on its non-profit trust as early as March 2007. (Caldwell Decl. ¶¶ 29–30; Caldwell Test. at 784:09–785:02.)

139. Ali claimed that he decided to work for Caldwell at Accretive because Caldwell was a rainmaker and had a gift for growing revenue. (Ali Test. at 453:11–454:14.)

140. Ali is the President of Accretive Insurance Agency and runs its day-to-day operations. In connection with this position, Ali reports directly to Caldwell. Caldwell has agreed to pay Ali an undetermined percentage of the profits of Accretive Insurance Agency as payment for services rendered. (Caldwell Decl. ¶ 7; Ali Test. at 156:05–14; Caldwell Test. at 684:21–25, 687:10–688:09.)

141. Caldwell paid Ali's attorneys fees for this action out of corporate proceeds until Brown filed a separate lawsuit against Accretive in Florida this year. (Caldwell Test. at 688:10–689:03.)

142. Besides Ali, Caldwell hired a number of former Brown employees, including Cothron, Childers Sr., Rakowski, and Bangloria, to work for his Accretive companies. (Caldwell Test. at 696:23–698:03.)

143. Caldwell, Cothron, Childers Sr., Bangloria, and Rakowski are all defendants in a lawsuit filed by Brown in Florida stemming from their own employment agreements. (Bangloria Decl. ¶ 44; Rakowski Decl. ¶ 39; Caldwell Decl. ¶ 67; Cothron Decl. ¶ 52; Bangloria Test. at 547:24–548:01.)

144. Cothron and Childers Sr. both work for NPIS. Caldwell hired Childers Sr. to work for NPIS specifically because Childers Sr. sits on the board of several non-profits. (Caldwell Decl. ¶ 38.)

145. Bangloria and Rakowski work for Accretive Insurance Agency and report to Ali. (Bangloria Test. at 549:11–18; Rakowski Test. at 560:18–19.)

146. Bangloria resigned from Brown on April 11, 2007, and returned his laptop to Brown on April 16, 2007. Bangloria's last day on Brown's payroll, April 25, 2007, was also his first day on Accretive's payroll. Bangloria admitted to doing work for Ali relating to the New Jersey pools (SEL, SAIF, and DIP) before April 25, 2007. (Bangloria Test. at 549:14–15, 550:14–18, 551:04–552:04.)

147. Caldwell gave inconsistent testimony in his deposition and at trial regarding precisely when he returned from an extended vacation and began work on Accretive. (Caldwell Decl. ¶¶ 28–31; Caldwell Test. at 690:12–692:02, 692:18–693:17.)

148. Caldwell claims that he did not do anything to form a new company or do any work on Accretive from the time he resigned from Brown on February 9, 2007, until he returned from a Caribbean vacation in late March 2007. (Caldwell Test. at 693:18–694:10.)

149. Caldwell also claims that "to the best of [his] recollection" he did not talk with anyone else about forming a new company or working on a new business opportunity, or about Accretive Insurance Group, Accretive Insurance Agency, or any related company from the time he resigned until after he returned from his

vacation in late March. (Caldwell Test. at 694:06–14, 696:01–08.)

150. Caldwell claims that the first time that he set up any documents with the Accretive name on them was after he contacted his accountant in March. (Caldwell Test. at 696:09–12.)

151. Caldwell also claims that Ali's brother, Mustaque Ali ("Mustaque"), set up email addresses for Accretive after Caldwell returned from his vacation in late March. This conflicts with his deposition testimony, which was that Ali arranged for Mustaque to set up the IT and email addresses for Accretive in April. (Caldwell Test. at 696:13–699:01, 699:16–701:12, 703:21–24.)

152. Upon questioning by Brown's counsel at trial, Caldwell admitted that he had the email address "scaldwell@accretiveins.com" as of February 14, 2007. Caldwell claims that this email address was set up by Mustaque and was intended to be Caldwell's personal email address. He further testified that he had no intention of forming a company called "Accretive" as of the time that email account was created. (PX120; Caldwell Test. at 699:02–15, 701:13–702:01, 703:09–704:01.) Based on the evidence and Caldwell's demeanor on the stand, the Court does not find this testimony credible.

153. Email fragments discovered within Ali's gmail account reveal that Ali also had an Accretive email address as of February 14, 2007, when he was still on Brown's payroll. The fragments also show that as of that date Ali was reviewing letterhead and business cards with Accretive logos. (PX252; Karchmer Decl. ¶ 8; Karchmer Test. at 497:16–499:06.)

154. At trial, when asked whether Ali was reviewing Accretive letterhead, logos and business cards during this time, Caldwell initially testified, "I do not know."

Subsequently, Caldwell testified that if Ali was working on Accretive logos it was "without his knowledge." (Caldwell Test. at 704:24–705:08, 707:09–709:10.) Based on the evidence and Caldwell's demeanor on the stand, the Court does not find this testimony credible.

155. Caldwell testified at his deposition that he did not have any communication with Ali from the time he resigned from Brown on February 9, 2007, until a week or two after he returned from vacation towards the end of March, and that Ali first began doing work for Accretive in early April. Caldwell admitted at trial that during the course of this litigation he has become aware of emails that make it appear that he did have communication with Ali in February and that Ali was doing work for Accretive in February, but claims he can't recall them. (PX120; Caldwell Test. at 694–695, 699:16–701:12,-703:21–704:17.)

156. Ali denies that he had an email address with Accretive on February 14, 2007. Instead, he claims that the email address "mali@accretiveins.com" was the email address of his brother Mustaque. Ali stated that his email address for Accretive has always been "munawar.ali@accretiveins.com." Ali acknowledged that Caldwell's email address at Accretive is currently "shane.caldwell@accretiveins.com," but was "scaldwell@accretiveins.com" in February 2007 when the email addresses were first created for Accretive. (Ali Test. at 408:01–15, 460:14–461:09; PX120; PX224; Ali Test. at 478:08–479:22.)

157. Ali denies working on Accretive business cards and letterhead in February 2007. (Ali Test. at 408:16–25, 409:01–03.) Based on the evidence and Ali's demeanor on the stand, the Court does not find Ali's denials credible.

## VII. Ali's Laptop

158. On Saturday February 3, 2007, three weeks before Ali resigned, someone logged into Ali's laptop using his username and performed a Google search for "Cleanup!," which is a data destruction utility or "wiping" program. Another wiping program called "Eraser" was downloaded by someone using Ali's username ("mali") from an open-source software site called sourceforge.com. (Parker Decl. at ¶ 24; Ali Decl. ¶ 29; Karchmer Decl. ¶ 10; Ali Test. at 145:17–19; Karchmer Test. at 521:20–522:15.)

159. On the same day, someone installed two different data destruction or "wiping" software programs on Ali's laptop. One program was called "Cleanup!" (which had been located the same day using a Google search) and the other was called "Eraser." One can obtain both of these programs free of charge. (Karchmer Decl. ¶¶ 10–11; Karchmer Test. at 521:04–524:17.)

160. Six days before Ali resigned, on February 19, 2007, wiping software was run on his laptop, and more than 20,000 files were deleted and permanently overwritten. (Karchmer Decl. ¶¶ 12–14; Karchmer Test. at 522:16–523:22.)

161. Analysis of the unallocated disk space on the laptop hard drive shows that 90 percent or more of it was overwritten with random data, which is consistent with the use and capabilities of the wiping program Eraser downloaded on Ali's laptop on February 3, 2007. (Karchmer Decl. ¶ 15.)

162. Analysis of the system registry from Ali's laptop shows that the Cleanup! software program was run four times after it was installed on February 3, 2007, that it was set to "wipe" (i.e., permanently overwrite) data and not just delete files, and that it wiped over 60,000 total files and

1.75 GB of information from Ali's hard drive. (Karchmer Decl. ¶ 16; Karchmer Test. at 523:23–524:17.)

163. Eraser and Cleanup! are both designed to obfuscate signs of their being used. The Cleanup! software on Ali's laptop indicates that a custom wipe setting was used, which shows user intervention with respect to customization. (Karchmer Decl. ¶ 17.)

164. Ali testified that Sayez Rahim ("Rahim"), a friend of his and formerly an IT employee at Brown, had run the Cleanup! and Eraser wiping programs on his laptop because he obtained a computer virus from visiting some "adult" websites. Ali did not call Rahim, who no longer works at Brown, as a witness at trial. Ali testified that Rahim was on his honeymoon during the time of trial in October 2008, and thus was unavailable; however, Rahim was never listed by Ali as a witness or potential witness when this trial was originally scheduled to proceed in May 2008. (Ali Test. at 201, 460–61; see R. 83, Joint Final Pretrial Order; R. 108, Revised Joint Final Pretrial Order.)

165. The Cleanup! and Eraser wiping programs are not ones that would be used by an IT professional to address Internet activity or the integrity of the office network. Wiping programs are solely designed to destroy data. If there was a virus that had been downloaded as a result of Internet activity, an IT administrator would run diagnostic software in an attempt to isolate and identify any virus that might be on the machine. (Karchmer Test. at 525:01–526:06, 530:07–11.)

166. The last time Rahim logged onto Ali's laptop was on September 11, 2006. There is no evidence of Rahim logging on to Ali's laptop after that date. (Karchmer Test. at 526:07–528:06.)

167. Based on the evidence and Ali's demeanor on the stand, the Court does not find credible his testimony that Rahim ran the wiping programs on his laptop. Instead, the Court finds that Ali ran these wiping programs in an effort to hide the work he was doing for Accretive and other potential breaches of his employment agreement.

## VIII. Brown's Confidential Information

168. Brown diligently protected the confidential information it provided to Ali by, among other things, mandating the obligation to safeguard this information in its Employee Handbook and its Employment Agreement. (Parker Decl. ¶¶ 11, 13–14; PX001; PX002; PX003; PX007.)

169. As a Profit Center Leader, Ali attended the quarterly leadership meetings with Brown senior leadership and other profit-center leaders. At these meetings, Brown revealed and discussed detailed financial information for every office in the entire company. Executive attendees receive a "bluebook" containing company-wide confidential information, such as revenues, expenses, contingencies, and bench-marking. The attendees also participated in break-out sessions to discuss confidential company strategies, initiatives, and techniques for improving performance. (Parker Decl. ¶ 15; Cothron Test. at 657:10–12, 657:21–24.)

170. Because part of Ali's job was to learn the needs and preferences of Brown's customers, Ali received on a regular basis customer-specific confidential information, such as the type of coverage desired, the types of risks that require coverage, losses, exposures, and the budget. Likewise, Ali received information regarding specific underwriters' requirements in order to assess the appetite of the carrier for various risks. Finally, as a Profit Center Leader, Ali was aware of the compensation arrangements between Brown and its employees in the BBPES Chicago office, and he had access to the expenses, revenues, and profits, of the Brown offices. All of the above-referenced confidential information assisted Ali in his position with Brown and enabled him to further develop relationships with Brown customers, business partners, and carriers. (Parker Decl. ¶¶ 16–17; Cothron Test. at 657:14–20.)

171. Brown considers the following information about the insured valuable, as part of its business, and confidential: prior expiration dates, exposures, characteristics, loss runs, payroll information, employment concentration data, and all other information contained within the insured's applications. (Parker Test. at 138:22:–139:03; Rakowski Test. at 560:07–09; Cothron Test. at 658:03–09.)

172. While working for Brown, an employee cannot use or disclose Brown's confidential information to persons outside of Brown, such as a competitor. (Rakowski Test. at 560:10–13; Cothron Test. at 658:10–14.)

173. After working for Brown, a former employee cannot use or disclose Brown's confidential information to persons outside of Brown. (Rakowski Test. at 560:14–17.)

174. Brown did not share its plans for the formation of the Florida non-profit trust with its competitors. Brown's communications within the company about Brown's strategy for forming the non-profit trust were confidential, and Brown employees understood that they could not disclose Brown's strategy and plans for forming the non-profit trust with a competitor. (Cothron Test. at 663:22–664:17.)

175. The information that Heyman gathered from Florida retailers about their

non-profit business, which was subsequently sent to Chicago for evaluation in connection with Brown's non-profit trust, was confidential. (Caldwell Test. at 758:06–14.)

176. At Brown's Fall 2006 retreat, the Chicago BBPES office discussed Brown confidential information such as strategy, opportunities in the marketplace, and specific customer revenue and retention percentages. (PX064; PX245; Parker Test. at 109:17–110:25, 113:09–13.)

177. Ali had possession of his laptop on both March 3 and March 4, 2007, which were a Saturday and Sunday. A domain user account "mali" and a gmail user account m.munawar.ali@gmail.com were used on those days. In order to log into the laptop or gmail using those accounts, one must know their associated login names and passwords. (Karchmer Decl. ¶¶ 6–7; Karchmer Test. at 528:12–529:08.)

178. On Saturday March 3, 2007, Ali extracted and/or copied some or all of the contents of the zip file "B & B and Other Offices–Applications Completed.zip" to a new location apart from the hard drive. As a result of the extraction process, a temporary copy of the zip file was created and saved onto the laptop's hard drive. (Karchmer Decl. ¶ 3b; Karchmer Test. at 506:24–509:04.)

179. Also on Saturday March 3, 2007, Ali accessed the zip file "B & B and Other Offices–Applications Completed.zip" and in particular the constituent folder entitled "B & B Clearwater" found within the temporary copy of the zip file. (Karchmer Decl. ¶ 3d; Karchmer Decl. Ex. A; PX095; Karchmer Test. at 510:03–09, 520:11–23.)

180. Also on Saturday March 3, 2007, Ali accessed numerous Brown business-related documents. (Karchmer Decl. ¶¶ 4, 18; Karchmer Decl. Ex. A; Karchmer Test. at 510:10–521:03.)

181. Ali accessed a number of these documents from a "D:" drive, a drive external to the hard drive such as an external flash drive. Among the files accessed on March 3, 2007, from a "D:" drive were documents entitled "SD JPA Primary Forward JPA's Reports(first group).msg" and a document entitled "NON PROFIT INSURANCE PROGRAM Application.doc." The fact that these documents were located on a D: drive means that at some point they were saved to some location external to the hard drive, such as a flash drive. This indicates that Ali had Brown documents related to the San Diego JPA and the non-profit program saved to an external device of some sort as of March 3, 2007. (Karchmer Decl. ¶ 4; Karchmer Decl. Ex. A; Karchmer Test. at 511:01–518:05, 519:15–520:10.)

182. Ali does not dispute that someone using the username "mali" and his password accessed Brown's information on Saturday March 3 and Sunday March 4, 2007. However, Ali testified that he had no recollection of working on his laptop that weekend. (Ali Aff. ¶ 91–92; Ali Test. at 282:23–283:04.) Based on the evidence and Ali's demeanor on the stand, the Court does not find his testimony credible, and instead finds that Ali accessed these documents.

183. Ali retained hard copies of confidential documents relating to Brown business interests after leaving Brown's employment. In particular, he retained: financial documents detailing the expenses and income of his Chicago BBPES office and other Brown offices; a presentation revealing Brown's business strategies; the notes from the Fall 2006 retreat listing Brown projects, opportunities, and revenues; and an insurance application for the San Diego JPA dated February 20, 2007. (Parker Decl. ¶ 44; PX244; PX245; PX246; PX247; PX248; Parker Test. at 139:08–19.)

184. Ali claimed that he did not return those documents to Brown when he left because they were in a folio is his wife's office at their home, and he only discovered them later. (Ali Test. at 456:24–457:23.) Based on the evidence and Ali's demeanor on the stand, the Court does not find this testimony credible, and instead concludes that Ali purposely retained these documents.

## IX. Accretive's Florida Insurance Trust

185. In order to form the Florida Insurance Trust, known as "FIT," Accretive submitted documentation to the Office of Insurance Regulation of Florida. That documentation stated that Ali had created a non-profit pool in the State of Washington while he worked for Brown. That same documentation indicated that Ali is the chief financial officer of NPIS, which administers the trust. Ali claims that this is not correct and that he only works for Accretive Insurance Agency. (Ali Aff. ¶ 5; PX134; Ali Test. at 157:07–160:16; Cothron Test. at 665:05–11, 665:15–25, 666:03–7; Caldwell Test. at 765:11–14.)

186. Submitting documentation to the State of Florida was not the only action necessary to form FIT. Trust members needed to be located and their insurance pooled. To that end, Caldwell developed a PowerPoint for Accretive to use in presentations to potential trust members and to non-profit associations, whose members could join the trust. On June 1, 2007, Caldwell emailed Cothron and another Accretive employee a draft PowerPoint presentation about FIT. It included a synopsis of the Florida statute, the benefits of pooling, the pool's structure, and an overview of services and service providers. The email accompanying that PowerPoint presentation notes that they would be taking slides from the presentation to create an updated Accretive Group PowerPoint for meetings scheduled for the following Tuesday and Thursday. (PX132; PX133; Caldwell Test. at 730:03–20, 731:08–18, 734:24–736:10, 736:21–13.)

187. Caldwell mistakenly sent the email containing the PowerPoint presentation to Cothron's old email address at Brown. (Caldwell Test. at 731–36.)

188. The PowerPoint presentation Caldwell prepared for Accretive relating to FIT included much of the same content as the PowerPoint presentation he worked on for Brown regarding Brown's proposed non-profit trust. (PX132; PX087; Caldwell Test. at 729:18–730:02, 731:08–732:09.)

189. The Accretive PowerPoint presentation dated June 4, 2007, included a list of "key team members" of Accretive Insurance Group. Caldwell created this list. The persons listed as "key team members" of Accretive Insurance Group were Caldwell, Cothron, Childers Sr., Ali, Keller of GRS, and Young of PEGAS. (PX133; Caldwell Test. at 738:14–739:03, 742:18–743:07, 764:19–765:07.)

190. Caldwell admitted that he listed Keller as a "key team member" because Accretive's relationship with Keller and his companies was important. (PX133; Caldwell Test. at 738:14–739:20.)

191. One of Keller's companies, Specialty Risk Solutions, LLC ("SRS"), places two lines of coverage for FIT because it has an exclusive relationship with Specialty Underwriters Alliance ("SUA"). Keller owns one-half of SRS and one-half of GRS. Caldwell described the relationship between Keller's company and Accretive as an "important" one. The company enabled FIT, which has a low self-retention amount, to receive the working lines of coverage and receives a commission in exchange. (Parker Decl. ¶ 26; Rakowski Decl. ¶ 26; PX131; Parker Test. at 68:04–

14, 115:08–11, 115:17–117:06, 119:05–120:01, 120:09–121:03; Caldwell Test. at 739:6–20.)

192. Caldwell also admitted that he listed Young of PEGAS and Keller of GRS/SRS as "key" team members of Accretive because he intended to have a business relationship with them going forward. (PX133; Caldwell Test. at 742:18–743:07, 744:02–15.)

193. Caldwell hoped to have a continuing business relationship with Young and Keller even though he knew that PEGAS's pools SEL, SAIF, and DIP were customers of Brown while Ali worked for Brown, and even though the San Diego JPA was a customer of Brown while Ali worked for Brown. (Caldwell Test. at 742:18–743:07, 744:02–20, 745:20–23.)

194. Caldwell knew that Ali solicited Young of PEGAS about writing insurance for SEL, SAIF, and DIP on behalf of Accretive. When confronted at trial with the fact that he previously admitted that Ali went after Brown customers for Accretive, Caldwell claimed these entities are not Brown "customers" because Ali solicited different lines of business. By contrast, at his deposition, Caldwell initially testified that he knew that PEGAS pools SEL/SAIF/DIP and San Diego JPA were customers of Brown while Ali worked for Brown, and did not draw a distinction between lines of business. (Caldwell Test. at 744–748.)

195. Accretive also made PowerPoint presentations listing Cherry of Lifestream and Georgini of Mid Florida as FIT board members and their organizations as founding trust members. (PX132; Caldwell Test. at 732:11–21.)

196. Lifestream was one of the first members of FIT. Mid Florida was one of the earlier members of FIT. (Ali Test. at 372:25–373:04; Cherry Test. at 432:18–23.)

197. Mid Florida became a customer of Brown roughly 10 to 15 years ago, and Mid Florida is still a customer of Brown for certain lines of coverage. However, Georgini ultimately decided to join the trust formed by Accretive because Brown's non-profit trust was still in the planning stages. Georgini is pleased with Brown's work on the lines of coverage that Brown still services for Mid Florida. (Georgini Dep. 22:11–17, 29:12–18, 32:10–16, 73:01–10.)

198. Caldwell admits that as of June 1, 2007, Accretive was pursing Georgini of Mid Florida and Cherry of Lifestream to join FIT. However, Caldwell claims that he did not know that Childers Sr. was on the board of Mid Florida even though in his trial declaration, he swore that he hired Childers Sr. because he "sits on the board of several non-profits." (PX132; Caldwell Decl. ¶ 38; Caldwell Test. at 732:11–21, 733:11–734:23.)

199. The current Board of Trustees of FIT is comprised of executives of non-profits that are members of FIT. Ali has met with various members of the Board of FIT, including Cherry of Lifestream. (Cherry Decl. ¶¶ 3, 12, 14; Weeks Decl. ¶¶ 3, 9, 12.) Georgini of Mid Florida never actually joined the Board. (Georgini Dep. at 76–77.)

200. SUA placed two lines of coverage for FIT. Ali helped secure that coverage through his longtime relationship with Keller of SRS/GRS. In Spring 2007, Ali attended a meeting with Caldwell, Keller, and several representatives of SUA to discuss FIT's coverage and certain specific non-profit entities that would join FIT. (Parker Decl. ¶ 26; Rakowski Decl. ¶ 26; Keller Test. at 344:18–346:17.)

201. Also in Spring 2007, Ali approached Levine regarding Liberty Mutual providing coverage for FIT. Levine had

the impression that Ali and his company Accretive had "high hopes" for FIT. Liberty Mutual currently writes the excess worker's compensation coverage for FIT. (Levine Decl. ¶ 25.)

202. Ali also facilitated the relationship between ACE and FIT. In late March or early April 2007, Vincelette of ACE received a write-up about FIT from Ali, and Ali now acts as the broker with respect to the ACE coverage for FIT. (PX250; Vincelette Dep. at 11:15, 15:05–10, 25:19–22, 26:03–04, 61:08–62:02, 62:11–63:02; Caldwell Test. at 712:02–15.)

203. Ali had Bangloria assist him in the negotiations with ACE, even though Bangloria was still a Brown employee at the time. On April 1, 2007, munawar.ali@accretiveins.com forwarded to Bangloria's personal email address, hasib.bangloria@gmail.com, certain emails between Ali and Vincelette and another employee of ACE with the title "FW:Non For Profit Insurance Trust." The text of the original email from Ali to Vincelette states: "Rich, hope all is well with you. Based on our last conversation, I am sending you the initial write-up FL Non Profit Insurance Trust. We would like to set up a time for you to visit with the initial board members and prospective members in Miami soon, I will call you tomorrow to discuss. Please feel free to call me with any questions." These email fragments were all found on Bangloria's laptop and were located in Bangloria's gmail inbox that is associated with the email address hasib.bangloria@gmail.com. (Karchmer Decl. at ¶ 8; PX250; Karchmer Test. at 530:12–533:11.)

204. Bangloria claims that he does not remember receiving emails from Ali about FIT and ACE while Bangloria was still a Brown employee. He also did not remember receiving emails from Ali's Accretive email address in March 2007. (Bangloria Test. at 556:16–557:06.)

205. Bangloria admits that his gmail email address in February, March, and April 2007 was hasib.bangloria@gmail.com. (Bangloria Test. at 556:10–15.)

207. At the time Ali was contacting Vincelette about ACE becoming a carrier for FIT, Caldwell was aware that ACE was one of the carriers that Brown contacted about being a carrier for its non-profit pool. (Caldwell Test. at 712–13.)

208. Accretive Insurance Agency and its employees sometimes communicate directly with FIT trust members. (PX194; PX224; Cherry Test. at 437:07–11.) For example, Ali and Bangloria emailed one of the initial members of FIT, United Cerebral Palsy of South Florida, in April 2007. (PX224; Ali Test. at 396:18–398:18; Caldwell Test. at 768:13–769:19.)

209. At trial, Caldwell at first testified that it was a "complete misrepresentation" to state that Ali worked directly with the founding members of FIT in April 2007. When confronted with an email showing Ali and Bangloria directly contacting United Cerebral Palsy of South Florida, one of the initial members of FIT, Caldwell confirmed that this was an instance when there was direct contact between Ali and a FIT member. (Caldwell Decl. ¶¶ 46–48; PX224; Caldwell Test. at 768:13–769:19, 770:16–19.)

210. Accretive Insurance Agency and its employees sometimes talk with retail agents about non-profit customers who want to join FIT rather than contacting FIT's administrator, NPIS. (Rakowski Decl. ¶ 29; PX172; PX199; PX200; PX221; Ali Test. at 373:25–376:19, 380:07–383:01, 390:13–391:08.)

211. Mid Florida received invoices for its insurance that list Ali and Rakowski as the client service representatives on the account and directing payments to Accretive Insurance Agency in Chicago. No one

ever called Mid Florida to state that the invoices incorrectly listed Ali and Rakowski as the client service representatives on the account. (PX139; PX140; Ali Test. at 376:25–379:15; Georgini Dep. at 85:16–86:17, 87:06–88:19, 89:02–04, 89:11–90:21, 91:02–10, 91:11–19; 91:20–92:02, 93:05–08, 94:07–14.)

212. Lifestream also received invoices for its insurance that listed Ali and Rakowski as the client service representatives, and directed payments to be sent to Accretive Insurance Agency in Chicago. (PX136; Cherry Test. at 435:15–23; 436:11–13.)

213. Caldwell claims that it was a mistake for Accretive Insurance Agency employees to speak with FIT members directly, and that invoices listing Ali and Rakowski as client service representatives were erroneous. He claims these errors occurred when the company was still in its early stages. However, as late as October 2007, Accretive Insurance Agency was still contacting retail agents directly about their non-profits, and as late as September 2007, Mid Florida received an invoice listing Ali and Rakowski as client service representatives on the account. (Caldwell Decl. ¶ 49; PX139; PX206; Caldwell Test. at 765:15–768:05.)

214. As the president of Accretive Insurance Agency, Ali reviews the materials his employees compile before they submit them to the carrier, and gives them instructions or suggestions on revisions needed. Until at least the end of January 2008, when Rakowski was deposed, Ali was involved with every individual FIT member. (Rakowski Test. at 560:18–25, 561:14–15, 562:08–17.)

215. In his trial declaration, Ali stated that FIT has occupied less than 10 percent of his work time in the last 12 months, and that about 60 percent of his work time has been devoted to meetings and negotiations with venture capitalists. (Ali Aff. ¶ 117.)

216. According to Caldwell, there is a "whole lot" of non-profit business and public entity business in the nation, "plenty for everybody," so there is no need for Accretive to solicit or service Brown customers. (Caldwell Test. at 745:24–746:09).

217. Despite Caldwell's statements, Ali and Accretive have solicited and serviced numerous Brown customers and prospective customers. In addition to the JPA and the New Jersey pools, Ali and Accretive solicited and/or serviced Mid Florida, Indian River, Sunrise ARC, Agency Community Treatment Centers, and Brookwood Florida. (PX152; PX156; PX172; PX197; PX199; PX200; PX219; PX220; PX221; Ali Test. at 373:25–376:19, 380:07–383:01, 385:09–386:23, 389:08–391:08, 392:10–394:20; Bangloria Test. at 551–53; Rakowski Test. at 567:03–568:02; Cothron Test. at 669:04–13; Caldwell Test. at 745:24–746:09.)

218. One example of Ali servicing Brown customer Mid Florida is a July 10, 2007, email. Ali received an email from retail broker Doug Childers Jr. ("Childers Jr.") targeting Mid Florida for membership in FIT and indicating that Ali and those working with him were "VERY competitive" on the account. Ali responded to the email by suggesting that more could be added into the premium relating to Mid Florida because "WE NEED some extra money." (PX200; Ali Test. at 373:25–376:19.)

219. Ali did this even though he knew that Mid Florida was a Brown customer. On September 11, 2007, with Mid Florida's decision on joining the trust apparently still up in the air, Rakowski received an email from the retail broker on the account, stating that "[B]rown and [B]rown is putting a lot of pressure on this insured." (PX199; Rakowski Test. at

567:03–568:02.) The Court rejects Ali's testimony that he did not know Mid Florida was a Brown customer.[2]

220. On October 25, 2007, after Mid Florida became a customer of Accretive, Childers Sr., Rakowski and others discussed sending the official paperwork over to Brown notifying it of the change of insurance. (PX197; Rakowski Test. at 565:10–566:24.)

221. After Rakowski received the information that Mid Florida was working with Brown already, Ali did not address whether Accretive's work for Mid Florida might be a problem due to the injunction and did not tell her that she could no longer work on the Mid Florida account given the injunction. (PX197; PX199; Rakowski Test. at 565:10–566:24; 567:03–568:02.)

222. Ali and his Accretive employees also worked with Indian River even though it was apparent that it was a Brown customer. On September 25, 2007, Ali received an email from Bangloria, which was also sent to Rakowski, detailing premiums for various accounts, including Indian River. The last column on this email indicates that the expiring premium was placed with PGIT, which is Brown's governmental pool. Ali testified that he was well aware that PGIT was a Brown pool, but that he had no recollection of seeing this email due to other matters he was attending to during this period. In his trial affidavit, Ali attested that if he did read the email, "which I may have, the reference to PGIT did not register in my memory." (PX152; Ali Test. at 206–208, 385–87; Ali Aff. ¶ 108.) Based on the evidence and Ali's demeanor on the stand, the Court does not find his testimony credible.

223. A retail agent contacted Cothron regarding placing Indian River into FIT and informed him that the submission for Indian River was competing with a pool administered by Brown called PGIT, and that Brown and PGIT was the incumbent on the account. (Cothron Test. at 669:04–13.)

224. After hearing that Brown was the incumbent on Indian River, Cothron did not ask Ali whether the injunction entered against him prohibited him from working on Indian River, and Ali did not tell Cothron or his employees that they could not work on Indian River given the injunction. (Cothron Test. at 669:24–670:07.)

225. On July 27, 2007, Ali received an email with the subject "Sunrise ARC" from Childers Jr., stating, "It has been brought to my attention that this account is on the fence... They have received the quote from Brown & Brown...." (PX220; Ali Test. at 389:08–390:12.)

226. On August 31, 2007, Ali also received an email from Childers Jr. stating, "Mun ... This is for Sunrise ARC. You may be interested to know it is a Brown and Brown Account." (PX221; Ali Test. at 390:13–391:08.)

227. Ali is "pretty sure" he told his team not to work on Sunrise ARC after

---

**2.** Additional evidence obtained by Brown following the trial further undercuts Ali's credibility on this point. Specifically, Brown has submitted a copy of an email obtained in the Florida litigation from Childers Sr. to Ali dated April 27, 2007, discussing the need to obtain policy information on Mid Florida from Brown, which in Childers's prediction was "going to be a little challenging...." (R. 185, Mem. in Supp. of Mot. for Contempt &

Sanctions, Ex. B.) Brown has also uncovered evidence that Accretive specifically targeted Brown customers for participation in FIT. Brown has submitted a copy of an email trail which included Ali, dated October 31, 2007, in which Caldwell confirmed that the commission for bringing a Brown customer to FIT would be 7 percent rather than the standard 6 percent. (*Id.*, Ex. A.)

receiving these emails. (PX219; Ali Test. at 391:09–15; Rakowski Test. at 563:22–24, 564:06–565:02.)

228. Ali also solicited and/or serviced Brown customer Agency for Community Treatment Services. For instance, on August 21, 2007, Rakowski emailed Ali and Larry Allen ("Allen") of GRS and SRS to discuss the submission received from Agency for Community Treatment Services. Allen indicated in an email that he would contact the carrier SUA about this non-profit if Ali wanted him to do so. (PX156; Ali Test. at 392:10–394:20.)

229. Ali solicited and/or serviced Brown customers Brookwood Florida East and Brookwood Florida Central. For instance, on September 26, 2007, Ali indicated in an email that he spoke with the retailer regarding Brookwood Florida East and Brookwood Florida Central and that a quote was needed. (PX172; Ali Test. at 380:07–383:1.)

230. On July 19, 2008, Caldwell called Heyman, who was still a Brown employee, and left him a voicemail stating in part: "Since you seem to have taken the other side … if I see you … I will knock your ass out. So you better not ever come within fifty feet of me. So. And when they fire 'ya, do not look to me to hire 'ya. Save this message. Use it in court. They're going to count on it. Because they're gonna fire your ass, when they lose all that business. But don't come to me." (PX266; Caldwell Test. at 759:10–763:07.)

## X. This Court's Injunction

231. On June 25, 2007, this Court entered a preliminary injunction, providing as follows:

1. Ali, his agents, servants, employees, attorneys, and those in active concert or participation with him who receive actual notice of this order by personal service or otherwise pursu-

ant to Fed.R.Civ.P. 65(d), are hereby ENJOINED from violating the terms of the non-solicitation provision of his Employment Agreement with Brown (¶ 8(b)), for a period of two years after Ali's employment at Brown, by directly or indirectly soliciting, diverting, accepting, or servicing—with regard to any line of insurance coverage—any person, firm or entity that was a customer or account of Brown during the term of his employment, or was a prospective customer or account to whom Brown made proposals about which Ali had knowledge, or in which he participated, within the last two (2) years of his employment with Brown, unless Ali obtains Brown's express written consent.

2. Ali, his agents, servants, employees, attorneys, and those in active concert or participation with him who receive actual notice of this order by personal service or otherwise pursuant to Fed.R.Civ.P. 65(d), are hereby ENJOINED from violating the terms of the confidentiality provision of his Employment Agreement with Brown (¶ 8(a)) by disclosing any confidential Brown information as defined in the Employment Agreement for a period of two years after Ali's employment ended with Brown, unless Ali obtains Brown's express written consent. If Ali possesses any written confidential Brown information, Ali shall return that information immediately.

*Brown*, 494 F.Supp.2d at 956–57.

232. Ali claims that after the Court entered the preliminary injunction, he had everyone come into his office and informed them of the injunction, and that he subsequently went to each employee's office to

ask if he or she had questions. Ali claims that he told Bangloria and Rakowski that they could not work on any Brown customer and that the particular line of business was irrelevant. (Ali Test. at 368:19–370:17.)

233. Ali never showed Rakowski a copy of the injunction. At the time of her deposition and based on a conversation with Ali, Rakowski thought that the injunction only prohibited Ali from working on the San Diego JPA. (Rakowski Test. at 563:01–14.)

234. Ali also never showed Bangloria a copy of the injunction. At the time of his deposition and based on his conversations with Ali, Bangloria thought that the injunction only prohibited he and Ali from working on SEL, SAIF, and DIP. (Bangloria Test. at 552:16–553:04, 553:12–555:04.)

235. At trial, Bangloria testified that Ali gave him one or two reminders that the Court entered the injunction and therefore they could not work on SEL. In contrast, Ali testified that he gave Bangloria monthly reminders not to work on any Brown customers (Ali Test. at 370:18–24, 371:09–372:01; Bangloria Test. at 555:05–18.)

236. Despite the fact that Ali claims that it is NPIS who regularly communicates with retail agents about the non-profits that may join FIT, as of the time of his deposition in late January 2008, Ali had not told Cothron that the Court entered an injunction against him. In fact, no one from Accretive had informed Cothron that the Court had entered an injunction against Ali, as of the time of his deposition in January 2008. (Cothron Test. at 664–68.)

237. From June 2007 until at least January 2008, when Cothron was deposed, Cothron had not altered his work for FIT based on the Court's injunction, even though it is NPIS which generally communicates with retail agents about the non-profits that may join FIT. (Cothron Test. at 664:23–25, 668:21–25.)

## CONCLUSIONS OF LAW

1. In diversity cases, the forum state's choice of law rules determine the applicable substantive law. *Sound of Music Co. v. Minn. Min. & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir.2007). Illinois follows the Restatement of Conflict of Laws approach, which applies "the broad principle that the rights and liabilities as to a particular issue are to be governed by the jurisdiction which retains the 'most significant relationship' to the occurrence and the parties." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill.2d 45, 316 Ill.Dec. 522, 879 N.E.2d 910, 919 (2007).

2. An Illinois appellate court case decided in March 2008, *Brown & Brown, Inc. v. Mudron*, 379 Ill.App.3d 724, 320 Ill.Dec. 293, 887 N.E.2d 437 (2008), is directly on point and directs that Illinois law should be applied in this case. In *Mudron*, which involved the same Brown employment agreement at issue here, the Illinois appellate court determined that even though the agreement contained a Florida choice of law provision, as a matter of public policy it would apply Illinois law because Illinois law provides its workers greater protection from the negative effects of restrictive covenants. *Id.*, 320 Ill. Dec. 293, 887 N.E.2d at 440. Specifically, Illinois law requires the court to consider hardship to the employee in deciding whether to enforce a restrictive covenant, whereas Florida law prohibits consideration of this factor. *Id.*; Fla. Stat. Ann. § 542.335(1)(g)(1). Like Ali, the former Brown employee in *Mudron* lived and worked in Illinois, and the court concluded that Illinois public policy required the application of Illinois law to his employment agreement.

3. The Court finds unavailing Brown's reliance on *Applied Micro, Inc. v. SJI Fulfillment, Inc.,* 941 F.Supp. 750, 754 (N.D.Ill.1996), for the proposition that this Court should not follow *Mudron.* Unlike in *Applied Micro,* there are no conflicting Illinois appellate court decisions at issue here. Rather, the only Illinois court to construe the Brown employment agreement held that the agreement is governed by Illinois law, notwithstanding the Florida choice of law provision it contains. When the Illinois Supreme Court has not spoken on an issue, the decisions of the Illinois appellate court are persuasive authority. *Adams v. Catrambone,* 359 F.3d 858, 862 (7th Cir.2004). Federal courts sitting in diversity will follow the state appellate court decisions "unless we have a 'compelling reason' to believe that they have stated the law incorrectly." *Id.* This Court finds no basis for concluding that the *Mudron* court stated Illinois law incorrectly. Although the Illinois Supreme Court as not decided this precise issue, in an analogous setting the Court chose to apply Illinois law notwithstanding a contractual choice of law provision selecting another state's law, where applying the other state's law would violate the public policy of Illinois. *See Morris B. Chapman & Assoc., Ltd. v. Kitzman,* 193 Ill.2d 560, 251 Ill.Dec. 141, 739 N.E.2d 1263 (2000). Further, the Illinois Supreme Court has long held that the public policy of Illinois requires a court to consider the hardship imposed on an employee in deciding whether to enforce a restrictive covenant. *Mohanty v. St. John Heart Clinic, S.C.,* 225 Ill.2d 52, 310 Ill.Dec. 274, 866 N.E.2d 85, 94 (2006); *Cockerill v. Wilson,* 51 Ill.2d 179, 281 N.E.2d 648, 651 (1972). Based on this case law, the Court concludes that the Illinois Supreme Court would apply Illinois law to this dispute as did the appellate court in *Mudron.*

4. Post-employment restrictive covenants are carefully scrutinized by Illinois courts since they operate as partial restraints on trade. *Cambridge Eng'g, Inc. v. Mercury Partners, Inc.,* 378 Ill. App.3d 437, 316 Ill.Dec. 445, 879 N.E.2d 512 (2007); *Arpac Corp. v. Murray,* 226 Ill.App.3d 65, 168 Ill.Dec. 240, 589 N.E.2d 640 (.1992). Illinois courts "abhor" restraints on trade. *Liautaud v. Liautaud,* 221 F.3d 981, 986 (7th Cir.2000). For a restrictive covenant to be valid and enforceable, the terms must be reasonable and necessary to protect a legitimate business interest of the employer. *Cambridge Eng'g,* 316 Ill.Dec. 445, 879 N.E.2d at 523. An employer seeking to enforce a restrictive covenant bears the burden of demonstrating that the full extent of the restraint is necessary to protect its interests. *Id.*

5. There are two ways an employer can establish a legitimate business interest sufficient to support a restrictive covenant: (1) by showing that it has a "near-permanent relationship" with its customers, and that but for his employment, the employee would not have had access to those customers; or (2) by showing that the employee acquired the employer's confidential information and attempted to use that information for his own benefit. *Appelbaum v. Appelbaum,* 355 Ill.App.3d 926, 291 Ill.Dec. 488, 823 N.E.2d 1074, 1081 (2005).

6. As to the first prong, a "near-permanent relationship with customers is generally absent from businesses engaged in sales." *Appelbaum,* 291 Ill. Dec. 488, 823 N.E.2d at 1083. "When the employer's business is sales of a non-unique product, its customers also do business with its competitors, are generally known to competitors, or are ascertainable by reference to telephone or specialized directories, the near permanency test will not be satisfied." *Id.* Here, although

Brown may have long-term relations with some customers, the evidence shows that the insurance industry is highly competitive, and that customers often move their business to other entities or even do business with various entities simultaneously when it is to their financial benefit to do so. Therefore, Brown has failed to establish a legitimate interest in a "near-permanent" relationship with its customers. *See Appelbaum*, 291 Ill.Dec. 488, 823 N.E.2d at 1084–85 (no protectible interest in near-permanent relationship with customers even though employer had long-term relations with some customers, since there was considerable fluidity in customer lists).

7. As to the second prong, Brown has established a legitimate business interest in its confidential business information, including its customer specifications, insurance carrier records, prospect lists, policy forms, rating information, expiration dates, risk-characteristics information, business plans, financial documents, strategic-opportunity lists, information concerning insurance markets for large or unusual risks, and the bluebooks received by the attendees of the quarterly leadership meetings that contain company-wide proprietary information like revenues, expenses, contingencies, and bench-marking. *See Lyle R. Jager Agency, Inc. v. Steward*, 253 Ill.App.3d 631, 192 Ill.Dec. 437, 625 N.E.2d 397 (1993) (insurance agency had protectible interest in customer information, given that customers are primary assets in insurance business); *Burt Dickens & Co. v. Bodi*, 144 Ill.App.3d 875, 98 Ill. Dec. 695, 494 N.E.2d 817 (1986) (insurance company had protectible interest in a list containing policy expiration dates, which constitutes highly valuable information in the insurance industry). Brown has also established that Ali used and/or attempted to use this information to his benefit in connection with his new position at Accretive Insurance Agency.

8. The next question is whether the restrictive covenant is reasonable. The reasonableness of a restrictive covenant is decided by the Court as a matter of law. *Cambridge Eng'g*, 316 Ill. Dec. 445, 879 N.E.2d at 522. Relevant considerations include the hardship caused to the employee, the effect upon the general public, and the scope of the restrictions in terms of their length, territorial scope, and the activities they restrict. *Id.* The reasonableness of a restrictive covenant depends on the unique facts and circumstances of each case. *Id.*

9. Non-competition and non-solicitation clauses are treated as distinct under Illinois law. *Cambridge Eng'g*, 316 Ill.Dec. 445, 879 N.E.2d at 528. In particular, while a non-competition clause must have a reasonable geographic scope, the same is not true of non-solicitation clauses. *Id.* "This is due to the fact that a tightly drafted nonsolicitation clause will narrowly circumscribe the class of people with whom contact is prohibited, so it need not preclude the availability of future employment opportunities, and as a result, territorial limits may not be necessary in order to protect employees' interests in finding posttermination employment." *Id.* However, a non-solicitation clause will be valid only if it is "reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer." *Id.*

10. A non-solicitation clause that prohibits contact with any customer, regardless of whether the former employee had contact with them during his employment, is "far broader than necessary to protect [the employer's] interest in preventing [the employee] from abusing the specific client relationships he built up dur-

ing his time with the company." *Cambridge Eng'g*, 316 Ill.Dec. 445, 879 N.E.2d at 528. Thus, Illinois courts will not enforce a provision that prohibits former employees from soliciting customers that they never had contact with while working for their former employer. *Id.*; *McRand, Inc. v. van Beelen*, 138 Ill.App.3d 1045, 93 Ill.Dec. 471, 486 N.E.2d 1306, 1315–16 (1985) ("The trial court may properly enjoin only activities involving the employer's customers with whom the former employees had been involved during their employment."); *see also Corroon & Black of Ill., Inc. v. Magner*, 145 Ill.App.3d 151, 98 Ill. Dec. 663, 494 N.E.2d 785 (1986) (refusing to enforce non-solicitation clause prohibiting solicitation of any customer of former employer because clause was overly broad); *Flexible Fin. Mktng., Inc. v. McGarry*, No. 03–52, 2004 WL 3269809 (Ill.Cir.Ct. Jan. 15, 2004) (same). The non-solicitation clause in Ali's employment agreement prohibits him from soliciting *any* customer of Brown as well as prospective customers of whom he had knowledge, regardless of whether he had any involvement or relationship with that customer or prospective customer during his employment. (PX001.) This provision is overly broad under Illinois law. Accordingly, the non-solicitation clause contained in Ali's employment agreement, as written, is unenforceable.

■ 11. Judicial reformation of an unenforceable restrictive covenant is permissible under Illinois law, and a court may choose to modify an overly broad restrictive covenant rather than invalidate it outright. *Cambridge Eng'g*, 316 Ill.Dec. 445, 879 N.E.2d at 529–30; *Arpac Corp.*, 168 Ill.Dec. 240, 589 N.E.2d at 652; *Magner*, 98 Ill.Dec. 663, 494 N.E.2d at 793–94. This approach is particularly appropriate when the agreement contains a severability clause. *Arpac Corp.*, 168 Ill.Dec. 240, 589 N.E.2d at 652.

■ 12. Section 8(g) of Ali's employment agreement provides: "Should a court of competent jurisdiction declare any of the covenants set forth in this Section 8 unenforceable, each of the parties hereto agrees that such court shall be empowered and shall grant Company injunctive relief reasonably necessary to protect its interest." (PX001.) The Court construes this as evidencing an intent by the parties that the restrictive covenant should be enforced to the extent permitted by law. *See Sadler v. Creekmur*, 354 Ill.App.3d 1029, 290 Ill.Dec. 289, 821 N.E.2d 340, 346–47 (2004) (in interpreting restrictive covenant, court must give effect to the parties' intent).

■ 13. The Court will thus modify the restrictive covenant to prohibit Ali's solicitation of Brown customers with whom he had direct contact during his employment at Brown. As modified, the covenant does not impose an undue hardship on Ali or harm the public interest, since it allows Ali to work in his chosen field and also promotes competition within the non-profit and governmental insurance industry. As Ali's own witness recognized, there is a "whole lot" of non-profit and public entity business in the nation, "plenty for everybody," so that there is no need for Ali to solicit or service Brown customers with whom he had direct contact during his employment at Brown. (*See* Caldwell Test. at 745:24–746:09).

■ 14. The two-year time period of the non-solicitation provision in Ali's employment agreement is reasonable. *See Mohanty v. St. John Heart Clinic, S.C.*, 358 Ill.App.3d 902, 295 Ill.Dec. 490, 832 N.E.2d 940, 944 (2005) (three-year restriction reasonable); *Gillespie v. Carbondale & Marion Eye Ctrs., Ltd.*, 251 Ill.App.3d 625, 190 Ill.Dec. 950, 622 N.E.2d 1267

(1993) (two-year restriction reasonable); *McRand*, 93 Ill.Dec. 471, 486 N.E.2d at 1316 (two-year restriction reasonable).

15. Ali breached the non-solicitation provision of his employment agreement through his actions relating to the JPA and SEL/SAIF/DIP, Brown customers with whom he had a relationship during his employment at Brown. In particular, Ali breached the provision by: diverting the JPA to his longtime friend and current strategic partner Scott Keller of GRS; servicing the JPA by negotiating a rate reduction with the carrier; contacting SEL/SAIF/DIP about their insurance coverage and otherwise soliciting the position as wholesale broker of record; servicing SEL/SAIF/DIP by preparing insurance proposals and negotiating with the carrier on their behalf; servicing non-profit customers and prospective customers of Brown by preparing insurance proposals; negotiating with the carrier; reviewing quotes; and otherwise securing or attempting to secure insurance for those entities. The Court rejects Ali's proposed interpretation of the agreement and instead concludes, as it did in ruling on the preliminary injunction motion, that under the plain terms of the agreement Ali is barred from soliciting Brown customers for any line of insurance. This is a reasonable interpretation given the evidence adduced at trial regarding the competitive and relationship-driven nature of the insurance industry; the significant amount of time, effort, and money expended by Brown to cultivate customer relationships; the fact that brokers routinely attempt to grown their business by obtaining additional lines of coverage from existing customers; and the fact that Brown subsidized Ali's efforts to cultivate relationships with Brown customers during his employment.

16. Ali breached the non-solicitation provision of his Employment Agreement through his actions relating to the SEL/SAIF/DIP by giving his professional opinion to Bill Young of PEGAS about potential markets to replace Selective, thereby diverting one of Brown's customers, SEL, for the benefit of ACE Insurance, with whom Ali's new company has a close relationship.

17. Ali's Employment Agreement also contains a confidentiality clause. (PX001.) Under Illinois law, post-employment confidentiality agreements "have social utility in that they protect an employer from unwarranted erosion of confidential information." *Coady v. Harpo, Inc.*, 308 Ill.App.3d 153, 241 Ill.Dec. 383, 719 N.E.2d 244, 250 (1999).

18. Enforcement of the confidentiality provision of Ali's is appropriate because maintaining Brown's confidences was an express obligation in the agreement and Brown's Employment Handbook. Further, this obligation is reasonable given the highly competitive nature of the insurance industry and the sensitive nature of Brown's customer specifications, insurance carrier and prospect lists, policy forms, rating information, expiration dates, risk-characteristics information, and business strategies, which is valuable information not known to Brown's competitors. *See Steward*, 192 Ill.Dec. 437, 625 N.E.2d at 399; *Bodi*, 98 Ill.Dec. 695, 494 N.E.2d at 819; *see also Coady*, 241 Ill.Dec. 383, 719 N.E.2d at 250 (confidentiality agreement preventing dissemination or use of confidential information obtained during employment was reasonable and enforceable).

19. Ali breached the confidentiality provision of his employment agreement by retaining numerous confidential documents relating to Brown business interests after he left Brown's employment, includ-

ing financial documents detailing the expenses and income of his Chicago BBPES office and other Brown offices, a presentation revealing Brown's business strategies, the notes from the Fall 2006 retreat listing Brown projects, opportunities, and revenues, and the insurance application for the San Diego JPA dated February 20, 2007. The Court rejects Ali's testimony that he inadvertently retained these documents, and instead concludes that he did so intentionally. Ali also breached the confidentiality provision by copying many confidential Brown documents, such as the zip file entitled "B & B and Other Offices–Applications Completed.zip," from his company laptop. Finally, Ali breached the confidentiality provision by using Brown's confidential strategic information relating to its non-profit pool to assist a competitive venture, Accretive, and the Florida Insurance Trust. This confidential information included various customer and prospect information provided to him, customer applications, underwriting criteria, and a non-profit pool application.

■ 20. The Employment Agreement also prohibits Ali from "Organizing Competitive Businesses" and provides: "Employee agrees that so long as Employee is working for Company, Employee will not undertake the planning or organizing of any business activity competitive with the work Employee performs." (PX001.) Ali breached this contractual provision by undertaking the planning and organizing of Accretive while he was still employed at Brown. Specifically, there is evidence that Ali was reviewing Accretive logos and possessed an Accretive email address in February 2007, the month prior to his departure from Brown. The Court has no doubt that other evidence demonstrating Ali's planning efforts would have been found on his laptop had he not deleted and permanently overwritten

thousands of files with the help of a wiping software shortly before his departure. The "preliminary stages" doctrine Ali relies on is inapplicable, since that doctrine pertains to an employee's general fiduciary duties to his employer, not to situations where the employee is governed by a restrictive covenant. (R. 178, Ali's Post–Trial Brief at 20.) Indeed, one of the cases Ali relies on specifically holds that an employee may "form a rival corporation and outfit it for business while still employed by the prospective competitor" only "*absent a restrictive contractual provision.*" *Magner,* 98 Ill.Dec. 663, 494 N.E.2d at 790 (emphasis added). Ali was subject to such a restrictive contractual provision here, and Brown has proven that he violated that provision.

■ 21. Next, the Court must determine the appropriate measure of damages. Brown did not call a damages expert at trial, and just prior to trial this Court limited Brown's evidence of damages to those related to loss of the JPA account due to Brown's failure to disclose any other damages evidence prior to trial. (R. 152, 163.) With respect to the JPA account, Brown argues that it is entitled to $570,000 in lost revenue, because if Ali had not breached his Employment Agreement, "Brown would have received two years worth of revenue" from this account. (R. 173, Brown's Post–Trial Brief at 12.)

■ 22. Under Illinois law, it is the plaintiff's burden to establish not only that he sustained damages, but to provide a reasonable basis for computation of those damages. *Kohlmeier v. Shelter Ins. Co.,* 170 Ill.App.3d 643, 121 Ill.Dec. 288, 525 N.E.2d 94, 102 (1988). The purpose of an award of damages is to place the non-breaching party in the position he would have been in had the contract been performed, "but not to place him in a better position or provide him with a windfall

recovery." *Id.* Further, damages cannot be awarded on the basis of "speculation" or "conjecture." *Id.* Recovery of lost profits is allowed if the loss is proved with a reasonable degree of certainty. *Prairie Eye Ctr., Ltd. v. Butler,* 329 Ill.App.3d 293, 263 Ill.Dec. 654, 768 N.E.2d 414, 422 (2002); *Hentze v. Unverfehrt,* 237 Ill. App.3d 606, 178 Ill.Dec. 280, 604 N.E.2d 536, 540 (1992).

23. Although the Court concludes that Ali breached the non-solicitation and confidentiality provisions of his Employment Agreement, Brown has not supplied the Court with sufficient evidence of its damages to support the $570,000 award that it seeks. (*See* R. 173, Brown's Post–Trial Brief at 11–12.) Specifically, the evidence shows that Starich had no intention of keeping the JPA account with Brown once Ali announced his departure. (Starich Dep. 91–93, 99:9–16; Snearer Test. 589:5–9.) Although Ali facilitated the JPA's move in violation of his Employment Agreement, it would be speculative to conclude that absent Ali's breach, the JPA account would have stayed with Brown for an additional two years. Moreover, the JPA policy in place was a three-year "arrangement" with policies that were issued annually, subject to renegotiation. (Starich Dep. 78:8–24; Levine Decl. ¶ 6; Ali Test. 285–86:21–29.) Awarding Brown all of the profits it would have received had the JPA elected to stay with Brown during the entire period of the three-year arrangement would place Brown in a better position than it actually bargained for with the JPA.

24. Having failed to establish a proper basis from which damages can be computed, Brown is entitled only to nominal damages. *Hentze,* 178 Ill.Dec. 280, 604 N.E.2d at 540; *Kohlmeier,* 121 Ill.Dec. 288, 525 N.E.2d at 102. The Court therefore awards Brown $1 for Ali's violation of the Employment Agreement.

25. An award of reasonable attorney fees and costs to Brown is proper because Brown is the prevailing party under the agreement's attorneys fee provision given Ali's various breaches of the agreement.

26. The next matter is Ali's alleged contempt of this Court's preliminary injunction. (R. 81, 134.) Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Pearle Vision, Inc. v. Romm,* 541 F.3d 751, 757 (7th Cir.2008). "In order to prevail on a contempt petition, the complaining party must demonstrate by clear and convincing evidence that the respondent has violated the express and unequivocal command of a court order." *Autotech Tech. LP v. Research & Devel. Corp.,* 499 F.3d 737, 751 (7th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1451, 170 L.Ed.2d 276 (2008).

27. In ruling on the preliminary injunction motion, this Court's analysis was governed by Florida law, since the parties agreed at that time that Florida law applied. Florida law is more favorable to employers than Illinois law. *See Brown,* 494 F.Supp.2d at 950–55. Accordingly, this Court entered a broad preliminary injunction enforcing the plain terms of the agreement, and enjoining Ali from soliciting or servicing any entity that was a customer of Brown during the term of the agreement with respect to any line of coverage, as well as prospective customers of Brown of whom Ali had knowledge. *See id.* at 956–57.

28. Ali voluntarily withdrew his appeal of the preliminary injunction order, and thus, the preliminary injunction entered by this Court on June 25, 2007, remained in effect during the pendency of

this litigation. "[E]ven invalid injunctions must be obeyed unless stayed or reversed. . . . This rule prevents the violating party from using any supposed defects in the injunction as defenses in his adjudication in contempt." *SEC v. McNamee*, 481 F.3d 451, 454 (7th Cir.2007).

29. There is clear and convincing evidence that Ali violated the terms of the preliminary injunction by servicing various Brown non-profit customers and prospects in conjunction with FIT, including Mid Florida and Indian River, and by facilitating an insurance placement for Brown customer SEL.

30. A finding of contempt is appropriate because the injunction order sets forth in specific detail an unequivocal command, and Ali was not "reasonably diligent and energetic in attempting to accomplish what was ordered." *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989); *see also Int'l Star Registry of Ill., Ltd. v. SLJ Group, Inc.*, 325 F.Supp.2d 879, 883 (N.D.Ill.2004).

31. Ali failed to make a good faith effort to comply with the preliminary injunction because he: serviced Brown non-profit customers and prospects by placing their insurance or attempting to place their insurance; failed to inform his employees of the details of the preliminary injunction; and ignored emails specifically referring to Brown's customer relationship to proposed FIT members.

32. An extension of the restrictive covenant is proper because Ali violated the plain terms of this Court's injunction by soliciting and/or servicing SEL/SAIF/DIP, Mid Florida, Indian River, and other Brown customers, thus depriving Brown of the benefit of the agreement during this period. *See Prairie Eye Ctr.*, 263 Ill.Dec. 654, 768 N.E.2d at 424 (affirming trial court's imposition of two-year extension of restrictive covenant in

addition to monetary damages, since "[t]he injunction is to enforce the covenant not to compete for which [the employer] bargained and did not receive."); *Vascular & Gen. Surgical Assocs. v. Loiterman*, 234 Ill.App.3d 1, 175 Ill.Dec. 232, 599 N.E.2d 1246 (1992) (extending two-year restrictive covenant to run from the date of contempt finding). Accordingly, the non-solicitation clause in Ali's employment agreement, as modified by the Court, will be extended to run for two years from the date of this order. The Court declines, however, to enter the broad injunction requested by Brown prohibiting Ali and his employees and agents from performing any further work on the Florida Insurance Trust. (*See* R. 173, Brown's Post–Trial at 29.) Such an injunction would be far broader than necessary to protect Brown's legitimate business interests, and would operate as a total restraint on competition, which is not favored under Illinois law.

33. "Civil contempt sanctions are properly imposed . . . to compensate the complainant for losses caused by the contemptuous actions." *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir.2005). The Court may in its discretion award attorneys fees in a contempt proceeding. *Id.* Throughout this litigation, Ali's practice has been to make repeated, categorical denials of any wrongdoing, until he is faced with direct evidence uncovered by Brown showing his statements to be false; he then equivocates, rationalizes, and when all else fails, argues that even assuming his conduct occurred, it did not violate the technical requirements of the preliminary injunction or his Employment Agreement. An award of attorneys fees to Brown is proper as a sanction for Ali's contempt, given the substantial resources Brown was required to expend to uncover Ali's wrongful conduct. *See Am. Family Mut. Ins. Co. v. Roth*,

No. 05–3839, 2008 WL 168693, at *6 (N.D.Ill. Jan. 15, 2008) (awarding plaintiff attorneys fees after a finding of contempt, based on the "considerable resources" that were expended due to defendant's failure to comply with court orders); *Int'l Star Registry*, 325 F.Supp.2d at 885 (awarding attorneys fees for contempt).

■ 34. The remaining matter is Brown's third motion for contempt, accusing Ali and certain witnesses of committing perjury during the trial. As fully described in Brown's supporting memorandum, Ali made numerous sworn statements in declarations filed with this Court and gave testimony under oath that, based on newly discovered evidence, was very likely false. Ali's witness, Caldwell, also made sworn statements and gave testimony under oath that now appears to be false. Upon review, the Court finds it necessary to refer this matter to the U.S. Attorney for an investigation, and any further action he deems necessary, regarding possible perjury committed by Ali and Caldwell in violation of 18 U.S.C. § 1621.[3]

■ 35. The Court is frustrated by the lack of an appropriate monetary penalty for Ali's egregious conduct in this case. The Court explored entering a direct monetary sanction against Ali for unduly and vexatiously extending these proceedings; however, 28 U.S.C. § 1927, which allows for imposition of such a sanction, only applies to attorneys. Further, an award of monetary sanctions for civil contempt is not permissible absent evidence of actual loss, which Brown has not provided. *See Autotech Tech. LP*, 499 F.3d at 752 ("When the purpose of sanctions in a civil contempt proceeding is compensatory, a fine, payable to the complain-

ant, must be based on evidence of actual loss."). In view of Ali's repeated violations of his Employment Agreement, his pattern of false statements and testimony, his violation of the preliminary injunction order, and his overall contemptuous behavior, it is extremely unfortunate that Brown did not present adequate evidence of its monetary damages, upon which this Court could have based an appropriate damages award. The Court can only hope that the award and sanctions imposed will be sufficient to deter the type of deliberate behavior Ali has chosen to pursue in this litigation. Our justice system is not a game to be won by the party who lies the best.

## CONCLUSION

For the reasons stated herein, judgment is entered in favor of Brown and against Ali in the amount of $1. Brown's Motion for Contempt (R. 81), Supplemental Motion for Contempt (R. 134) and Motion for Contempt & Sanctions (R. 183) are granted to the extent stated herein. Brown is entitled to recover its reasonable costs and fees pursuant to the Employment Agreement. To the extent the attorneys' fees provision in the agreement does not encompass all costs and fees incurred in connection with Ali's contempt of this Court's preliminary injunction order, Brown is also entitled to recover these costs and fees as a sanction for Ali's contempt. The restrictive covenant contained in Ali's Employment Agreement, as modified herein, shall be extended for a period of two years as a sanction for Ali's contempt.

Within seven (7) days of this opinion, Brown shall file a proposed injunction order that comports with the terms of this opinion and includes a list of Brown customers whom Ali is prohibited from solicit-

---

**3.** After reviewing Bangloria's affidavit and trial testimony, the Court declines to take any action against him as requested by Brown.

ing or servicing, as delineated herein. Within twenty-one (21) days of this opinion, Brown shall file a comprehensive motion for its reasonable attorneys fees allowed in this opinion.